**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| **LI CHE**<br>Room 1702, No. 6 Building<br>Middle Area Golden International Community<br>Zhangdian District, Zibo City<br>Shandong Province, P.R. China<br>**Plaintiff**<br><br><br>**-vs-**<br><br>**HSEIN CHENG CHANG** aka Sam H. Chang<br>8812 Sleepy Hollow way<br>Potomac, MD  20854<br>SERVE:<br>     Dennis Quinn, Esq.<br>     Carr Maloney, PC<br>     2020 K Street, N.W.<br>     Suite 850<br>     Washington, DC  20006<br>And<br>**WASSERMAN, MANCINI & CHANG, PC**<br>1915 Eye Street, N.W.<br>Suite 400<br>Washington, D.C. 20009<br>SERVE:<br>     Registered Agent<br>     WASSERMAN, MANCINI & CHANG, PC<br>     1915 Eye Street, N.W.<br>     Suite 400<br>     Washington, D.C. 20009<br>SERVE:<br>     Dennis Quinn, Esq.<br>     Carr Maloney, PC<br>     2020 K Street, N.W.<br>     Suite 850<br>     Washington, DC  20006<br><br>**Defendants** | **Complaint for a Civil Case Alleging Negligence/Legal Malpractice**<br>(28 U.S.C. § 1332; Diversity of Citizenship)<br><br><br>Case No. _____<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

The Plaintiff, Li Che and by and through her attorneys, Eisler Hamilton, LLC, and M. Christina Hamilton, Esquire., files this Complaint against Hsien Cheng Chang aka Sam H. Chang ("**Chang**") and the law firm of Wasserman, Mancini & Chang, PC ("**WMC**"), and in support of this Complaint states the following:

## NATURE OF THE ACTION

The Plaintiff brings this suit against Plaintiff's former attorneys, Defendants Chang and WMC, for negligence, breach of contract and breach of fiduciary duty relating to Defendants' legal representation of Che pursuant to the EB-5 Visa Program.

1.  The EB-5 program provides a method of obtaining a permanent residence, ("green card") for foreign nationals who invest money to promote economic development in the United States.  The program, which is administered nationally by the U.S. Citizenship and Immigration Services, provides green cards to individuals who invest, in this instance, $1,000,000 in a new business enterprise ("regional center"), and creates at least 10 full time jobs for U.S. workers.

2.  In a typical EB-5 project, investor funds are invested in a regional center, the applicant may apply for a conditional green card.  If the project sustains 10 full time jobs for two years, the investor can apply to have those conditions removed from his or her green card and the investor may then live and work permanently in the U.S.

## JURISDICTION AND VENUE

3.  This Court has original jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(a).  This Court has personal jurisdiction over the Defendants Chang and WMC.

Chang resides in Montgomery County.  WMC through the acts of its attorneys who are

licensed in Maryland have ongoing, substantial and intentional business contacts with

Maryland.

4.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b). Venue is

proper as the majority of necessary witnesses reside in this Judicial District.  Venue is

proper as the former site of the proposed regional center KZDJ.  Venue is proper as there

are three bankruptcy estates of related witnesses or entities currently open in this Judicial

District.  This venue represents the most convenient forum for all parties.  Plaintiff have

recently removed to the Bankruptcy Court the fraudulent conveyance and conversion

actions against Peide Yan, Xiaolan Zhang, and transferees of property belonging to KZDJ

or money transferred from investment funds belonging to Li Che and her husband,

Zhengang Zhang.

## PARTIES

5.   Plaintiff, Li Che ("Che") is an individual who currently resides in China and is the

wife and is married to Zhengang Zhang ("ZZhang").  They have one daughter who

attends school in Washington, DC.  ZZhang and Che are shareholders and officers of

KZDJ, Inc. ("**KZDJ**").  KZDJ  is a Virginia Corporation registered to do

business in Maryland. From 2013-2015, KZDJ dba American Luxury Boutique, operated

a gift shop located at 1540 Rockville, Pike, Rockville, Maryland.  As a direct result of the

facts alleged in this complaint, ALB closed its doors on April 2, 2015.

6.   Hsein-Cheng Chang, Esquire, aka Sam H. Chang ("Chang") is an individual who

resides in Montgomery County, Maryland.  Chang is a named partner of the immigration

law firm of Wasserman, Mancini & Chang.

7.   Wasserman, Mancini & Chang, PC ("WMC") is a District of Columbia

Professional Corporation doing business as a law firm in the District of Columbia. The

last known principle address in 1915 Eye Street, N.W. Suite 400, Washington, D.C.

20009.  Currently the WMC has three members, Mark A. Mancini, "Mancini", Senior

Member, Sam H. Chang, Senior Member, and Richard H. Chang, junior member.

8.   WMC advertises its services in Maryland through the participation of Chang and

Richard as co-hosts of *Immigration Law Today* on World Today Cable TV, Comcast

Montgomery County Maryland.    Richard is licensed in Maryland and practices law in

Montgomery County.

9.   Chang advertises himself as the "Exclusive Immigration Consulting Lawyer for

Chinese AOL, 2006-2007," "Vice President of Chinese American Chamber of

Commerce, 1988-." "Named Top 1% of all lawyers in DC Metropolitan Area by the

Washingtonian Magazine."

10. Chang and WMC served as counsel to Che in furtherance of her desire to seek

permanent residency through the filing of an "original immigration petition EB-5,

Immigrant Investor."

## STATEMENT OF FACTS COMMON TO ALL COUNTS

11. In 2012, ZZhang on behalf of Che came to the United States to purchase real

property or in the alternative look for possible business investments to facilitate the

immigration process.   ZZhang's then 12 year old daughter, "Shen," wished to attend

school in the United States.

12. ZZhang had a thriving business in China where he maintained a home with his wife, Che and Shen, in the Shandong Province.

13. According to documents filed with the EB5, ZZhang had at all times relevant to this Complaint a proven history of developing successful business strategies to manage company resources and personnel.  ZZhang would implement these strategies in struggling businesses and improve the company's overall financial performance.

14. According to documents filed with the EB5, in China, Li Che has 30 years of work experience serving as  Worker and Vice Workshop Manager of Produce Department.

15. As part of a group of foreign investors interested in immigration, ZZhang traveled to Florida in 2012 and met several individuals from the Shandong Province, Qing Yuan ("Qing") aka Lily, her brother Hongtao Yuan ("Hongtao") and their sister Guizhi Yuan ("Guizhi") aka Michelle.

16. The Shandong Province is a relatively remote area of China where family ties to the Province often serve as bona fides before business relationships can actually be developed.

17. Qing, Hongtao and Guizhi Yuan (collectively, "the Yuans") advised ZZhang that EB 5 projects in Washington were more lucrative because the high return of the investment in a shorter amount of time.  The Yuans advised that investments in Washington, DC were less risky.  ZZhang speaks only an uncommon dialect of Chinese, and ZZhang was at a complete significant disadvantage in evaluating the veracity of their claims.  However, ZZhang was enthusiastic about the EB5 investment opportunities.

18. The Yuans invited ZZhang to go sightseeing in Washington, DC, a place that

ZZhang intended to visit.  Qing and Guizhi accompanied ZZhang on his flight to

Washington, DC, and spoke highly of a wealthy Washington DC couple who had

experience operating successful businesses that could potentially serve as a qualifying

investment for ZZhang's EB5.

19. Upon arriving in Washington, DC, ZZhang was brought to the home of Xiaolan

Zhang ("Xiaolan") aka Xiaolan Zhang by the Yuans.  Xiaolan invited ZZhang to stay at

her house located 405 Great Falls Rd. Rockville, Maryland for several weeks.

20. During the visit, Xiaolan told ZZhang that she owned a lucrative luxury goods

store for many years and was a successful business woman.

21. Xiaolan introduced ZZhang to  Peide Yan ("Peide"), her husband

and the father of her three daughters the oldest of whom is named Doreen.

22. Peide told ZZhang that after owning and operating a successful Chinese restaurant

for over twenty years in Washington, DC, Peide was reaping the benefits of an early

retirement by drawing a pension of approximately twenty-thousand dollars ($20,000.00)

per month.

23. For two weeks, ZZhang observed Xiaolan and Peide closely as a guest in their home

and the couple appeared to have all the material trappings of success such as expensive

clothing, hand bags and jewelry.

24. In reality, Xiaolan's successful façade was purchased through an elaborate Ponzi

scheme using other individuals credit cards to purchase inventory at high end department

stores to resell at 20% off retail.  Money generated would be used for Xiaolan's personal

use and to also repay earlier victims who were threatening to file criminal charges.

25. Unbeknownst to ZZhang, Xiaolan, a convicted Felon , was on probation

through the United States District Court of Maryland Southern Division in case styled *U.S.A vs. Xiaolan Zhang*, Case No.8:11-cr-00506 for crimes involving bankruptcy fraud as a result of <u>false oaths</u> made in connection with her Chapter 7 Bankruptcy filing. Unbeknownst to ZZhang, Xiaolan had filed for Chapter 7 Bankruptcy on May 9, 2010, BK Case No. 10-14860.

26. In 2012, in Montgomery County, Maryland, Xiaolan Zhang was also charged with various theft and fraud crimes, and plead guilty to Use/Disclose Payment Device Numbers, *State of Maryland vs. Zhang, Case No. 120199C.*  Xiaolan was placed on probation in Montgomery County until June 24th, 2015. These convictions are available to the general public on Maryland Judiciary Case Search.

27. Even Peide's marriage to Xiaolan was part of the ruse.  Peide has never been married to Xiaolan.  Despite fathering her three children, Peide married in 2009, Chen Hua Chang ("Chen Hua"), a Taiwanese Citizen, and Xiaolan's sister during a time when multiple judgments were entered against both Peide and Xiaolan.

28. Chen Hua and her two children from a previous marriage Wente and WenWen Lin, also reside with Peide and Xaiolan.

29. ZZhang was also unaware that the store owned by Peide and Xiaolan, ("Zandy, LLC") which did business under the trade name "Bellissima" in Chevy Chase, Maryland had filed Chapter 7 Bankruptcy on March 7, 2012.  Zandy , LLC was evicted from their space and the Trustee had already auctioned off the inventory in order to recoup losses for the numerous creditors of Xiaolan, Peide and Zandy, LLC.

30. For his entire two week stay in Washington, DC, ZZhang was wined and dined by

Xiaolan and Peide who persuaded ZZhang to invest in another luxury goods store to be opened in Washington, DC.

31. ZZhang's understanding of the EB-5 Immigrant Investor Visa Program "EB5" was limited to what was told to him through friends, acquaintances, and other investors interested in obtaining permanent residency.  ZZhang believed that by investing $1,000,000.00 in a new business enterprise ZZhang, Che and Shen could successfully immigrate to the United States.  Che was concerned that $1,000,000.00 was a large amount of money that would require a substantial hardship for ZZhang and Che to raise. ZZhang and Che were concerned that investing in an American business was risky because neither spoke or read English.

32. Xiaolan, Peide and Guizhi reassured ZZhang who in turn reassured Che that his inability to speak or understand English would not be an obstacle to a successful business in the United States because Xiaolan knew a very successful immigration attorney, Sam Chang, who spoke Mandarin and English fluently.

33. Guizhi, provided further assurances of Xiaolan's financial success and business acumen.  Moreover, ZZhang had the unique perspective of being guest in their home for several weeks and Xiaolan presented herself as an honest, trustworthy and experienced business woman with a doting husband raising her three children in a large 6 bedroom home in the posh Washington, DC suburb of Rockville.

34. In November, 2012, with the assistance of Peide and Xiaolan, ZZhang individually and acting as proxy for Che incorporated KZDJ in the State of Virginia.  The purpose of KZDJ was to own and operate a luxury good store called American Luxury Boutique ("ALB") managed by Xiaolan and Guizhi.  The investors of KZDJ would be

ZZhang and Che.  The purpose of KZDJ was to provide a new business in which ZZhang and Che could use as their EB5 investment or "regional center."

35. The parties agreed that Guizhi and Xiaolan would manage the day to day operations of KZDJ and ZZhang and Che would invest $1,000,000.00 in KZDJ in furtherance of their EB5 Petition.

36. At the same time on nearly the same date in November, 2012, the Yuans also incorporated ZYD in the State of Virginia to purchase, own and operate a Chinese restaurant.

37. On or about November 7, 2012, ZZhang, President of the newly formed KZDJ designated Qing, Vice President of KZDJ, and Peide, Secretary.  ZZhang opened at SunTrust Bank a business checking account ending in 9485 by corporate resolution signed by all three officers.  Satisfied that ZZhang had the infrastructure in place for a successful regional center, ZZhang returned to China to discuss the business plan with Che.  Che began raising the capital for the EB5 investment.

38. On or about March 10, 2013, Che requested that ZZhang go to the United States to discuss the EB5 program with an attorney.   On or about March 10, 2013, ZZhang was taken to the law office of WMC by Xiaolan to discuss the requirements of the EB5 Application ("EB5").  Xiaolan insisted that Chang was the best immigration attorney in the area.  Because ZZhang could not read, write or speak English, the entire consultation was conducted in Mandarin which was the native language of Chang, Xiaolan and ZZhang.

39. ZZhang wanted to work with an attorney who spoke Mandarin so that ZZhang

and Che could have a representative in the United States.  ZZhang would continue to

operate businesses in Chinga and Che would eventually accompany their daughter to the

United States.  Che was reassured that she could communicate directly with Chang

without the added expense of using a translator.  Che also wanted to make sure that their

representative be able to read English documents and apprise Che and ZZhang in Chinese

without the delays inherent in using a translations service.

40. Chang assured ZZhang that communication with his office would be facilitated

Because Chang spoke Mandarin and English fluently.

41. Based upon advice given by Chang during this meeting, on March 13, 2013,

ZZhang, Li Che, Xiaolan and Guizhi entered into an investment agreement in furtherance

of ZZhang and Che's EB5, titled, "**DC Duty Free Store**." The Agreement was translated

from Chinese ("**DC 1**") to English ("**DC 2**") by Xiaolan and was executed by both

parties.   Unbeknownst to ZZhang and Che, DC 2 was not translated correctly by

Xiaolan.

42. DC 1 appears to be a poorly drafted stock purchase agreement to be

secured by the homes of Guizhi and Xiaolan.  DC1, is an agreement between ZZhang and

Che as the stockholders of KZDJ and Guizhi and Xiaolan as managers.  ZZhang and Che

agreed to invest $1,000,000 into KZDJ in furtherance of their EB5.  The parties agreed

that Guizhi and Xiaolan were responsible for the daily operations of the store.  DC1 was

premised on the theory, as promised by Guizhi and Xiaolan, that KZDJ could provide a

substantial and quick return on the $1,000,000 investment made by ZZhang and Che.

Xiaolan and Guizhi promised to facilitate the EB5 for ZZhang and Che as well as hold

ZZhang and Che harmless for debts arising out of their management of the business.

43. To assuage the concerns of ZZhang, a successful businessman in his own right and Che who remained reluctant to invest such a large amount of money, Xiaolan and Guizhi promised to pledge their homes as collateral in lieu of a corresponding $1,000,000 investment themselves until KZDJ could generate a profit equal to ZZhang's and Che's own investment.  Xiaolan and Guizhi promised to start making payments toward their stock purchase beginning April 1, 2014, of $40,000 per month but only after the first year's operations.  Transfer of the 50% stock ownership was also contingent upon the successful immigration of ZZhang and Che.

44. ZZhang did not know that the investment agreement as drafted in DC1 did not comport with various restrictions regarding the $1,000,000 investment.  Che believed at the time that Chang would review all relevant documents so and independent translation was not necessary.

45. The EB5 process requires that applicants put $1,000,000 at risk and produce at least 10 full time positions but there are restrictions concerning the collateralization of the investment which were unknown to ZZhang or Che.  ZZhang and Che believed that any issues with the investment agreement would be addressed by Chang.

46. On March 14, 2013, ZZhang returned to China to assist Che in gathering documents requested by Chang for the EB5.

47. April 26, 2013, ZZhang and Che, wired $1,020,000 into KZDJ's SunTrust checking account 9485 ("KZDJ SunTrust Account"), $1,000,000 for the EB5 and $20,000 for the fee quoted by Chang for the EB5.

48. According to SunTrust records, on the same day, Peide withdrew from the KZDJ

11

SunTrust Account the entire $1,020,000 from 9485 ("STKZDJ 9485") and used those funds to open an unauthorized SunTrust checking account 9337 account for KZDJ ("STKZDJ9337").  Peide Yan was the only signatory on 9337.  Bank statements for both 9337 and 9485 were mailed directly to 405 Great Falls Road, Rockville, Maryland 20850, the home of Xiaolan and Peide.

49. ZZhang and Che had no knowledge of that Peide had wwhich was done without the knowledge or permission of ZZhang and Che.

50. May 12, 2013, Che sent to Chang and WMC certified Chinese documents with accompanying English translations, including confidential personal information, bank records, resumes, work histories and declarations for Che and ZZhang. Included in the documents is Che's Declaration which advised in paragraph no. 10 "**Following the receipt of funds in my Standard Chartered Bank account, I applied to transfer the investment capital of USD1,000,000 to the SUNTRUST Bank account of KZDJ INC (No. 1000153829485) on April 24, 2013, and the KZDJ, INC(No. 1000153829485) received my investment capital on April 26, 2013.**"

51. May 29, 2013 Peide writes a $500,000 check to himself from 9337 and deposits it into ZYD 8211 (a bank account owned by the Yuans in which Peide is a signatory). Unknown to ZZhang and Che, at all relevant times, Peide also had control of both ZYD and KZDJ accounts. From the moment Che transferred the EB5 investment into STKZDJ9485, Peide and Xiaolan began to use the money to pay earlier investors of Zandy, LLC or transfer funds to themselves or for the benefit of other entities they control:

> a.   June 8, 2013, from the ZYD 8211 and from the
>      $500,000 removed from KZDJ 9485, Peide and Xiaolan

write Check No. 111 $5,000 to Ivy Leung (a creditor of Xiaolan that was owed $80,000 for Xiaolan's fraudulent use of Ivy's credit cards 2010 to 2012)

   b.  June 10, 2013, from the ZYD 8211 and the $500,000 removed from KZDJ, Peide and Xiaolan write Check 112 $15,000 to Vannipa Smith (Partner, Employer of Xiaolan)

   c.  June 12, 2013, from the ZYD 8211 and the $500,000 removed from KZDJ, Peide and Xiaolan write Check No. 113 $20,000 to Zandy (an entity wholly owned by Peide and Xiaolan)

   d.  June 12, 2013, from the ZYD 8211 and the $500,000 removed from KZDJ, Peide and Xiaolan write Check No. 124 $20,000 to Zandy, Inc.

52. On June 14 and June 15, 2013, Xiaolan goes to see Chang without Che or ZZhang at WMC's Washington, DC office.  Neither ZZhang or Che were in the United States at the time of these appointments.

53. On June 17, 2013, Chang writes an internal memo to "Jessica" with notes regarding a EB5 investment for Che and instructions for Jessica to review Che's personal financial info and Husband's financial info.  Chang advises that the "1 million *is already* in US Company Account." (Emphasis Added)

54. On June 17, 2013, Chang emailed to Xiaolan only a retainer agreement for Che, a request for an initial payment of $3,000 to "Wasserman, Mancini and Chang, PC," and requested that Che responded to 5 numbered paragraphs.  Chang also asks for further documentation including tax returns from ZZhang and Che.

55. In the June 17, 2013 email Chang acknowledges that he has received and receipt

and reviewed the documents provided by Che to him on May 12, 2013.  Chang notes in paragraph number 5 of his email **"On the declaration of Che Li under item #2, she states that she completed an investment in KZDJ, Inc.  Is this the US Corporation?"**

56. On June 19, 2013, Xiaolan responded to Chang's email and advised that "I have emailed your mail to Mr. Zhang in China, they will prepare those ASAP, I will deliver document and check once it is ready."

57. In order to facilitate communication with Chang's staff, Che and ZZhang retained Bright Life China ("BLC"), a Mandarin-English translation service to assist in document translation and production.

58. On June 27, 2013, Che responded to Chang's June 17, 2013 email to Xiaolan through the translation service designating **Lydia from Bright Life China as Che's agent and translator.**  Copied on the email were Lydia at cindy@brightlifechina.com, Xiaolan at Xiaolan88Zhang@aim.com, ZZhang at Zhangzhengang1966@126.com, and another employee of BLC, Jerry@brightlifechina.com.

59. Lydia introduced herself as the designated agent for Che to assist in the preparation of Che's EB-5 immigration materials.  Lydia provided numerous ways to contact Che and Lydia including Lydia's own mobile number.

60. However, Lydia only provided responses to paragraphs 1-4 of Chang's June 17, 2013 email.  Lydia does not respond nor even mention paragraph no. 5 regarding Chang's inquiry of the Che's completed investment.  Request No. 5 is also missing from the body of Lydia's response.

61. Morevoer, in the June 17, 2013 email to Xiaolan, in paragraph No. 5, Chang asks

Che to explain how Che completed the $1,000,000 investment.  Despite Lydia's failure to

respond or mention paragraph No. 5 in Lydia's email response to Chang, Chang does not

follow up with Lydia or Che on this critical issue.

62. On July 1, 2013, on behalf of Che, Lydia emails Chang, "Have you received my

email?  Please reply to me as soon as possible.  Thanks! Lydia" Copied on the email are

ZZhang, Jerry from BLC and Xiaolan Zhang.

63. On July 8, 2013, on behalf of Che, Lydia emails Chang:

> "I made a call to your office last week but you were absent.
> Have you read my e-mails?  Please reply as soon as
> possible because Ms. Che Li really wants to know the
> progress of her case.  Or you can call me with +86 186
> 6197 6969."

64. On July 9, 2013, Chang sends an email to Xiaolan and this time includes Cindy at

BLC, stating;

> "We have enclosed for your further handling the retainer
> agreement for the EB5 case.  Please review, sign and return
> to our office with the retainer fee.  Once we receive the
> documentation, we will finalize the review of your
> documentation."

65. On July 11, 2013, from STKZDJ 9485, Peide and Xiaolan tender Check No. 102,

$40,500, to Ivy Leung.

66. On July 12, 2013,  Xiaolan sends WMC the retainer agreement and a check

for $3,000 but for unknown reasons Peide signs the retainer and not Che.   The Check is

drawn from the STKZDJ 9485 with the memo, "For Mr. Zhengang Zhang."  The return

address on the envelope is "Xiaolan Zhang, 405 Great Falls Road, Rockville, MD

20850."  Neither ZZhang nor Che were in the United States at this time.  Chang accepts

the documents without calling Che or emailing Che about the discrepancy.

67. On July 12, 2013, from STKZDJ 9485, Peide and Xiaolan send Check No. 103, in the amount of $35,705.00 to the United States Treasury for payment of Xiaolan 's personal income tax debt signed by Peide.

68. On July 14, 2013, WMC deposits Check No. 104 in the amount of $3000.00 into "Wasserman, Mancini & Chang, Regular Account" in Wachovia Bank.

69. On July 15, 2013, STKZDJ 9485, Peide and Xiaolan send Check No. 105 in the amount of $29,000 for Xiaochun Zhang for payment of Xiaolan Zhang's personal loan from the Zandy LLC business.  Xiaochun filed a proof of claim in Zandy's LLC.

70. On July 15, 2013, Chang signs Che's retainer agreement signed by *Peide*.

71. On July 15, 2013, Xiaolan sends an email to Chang and inexplicably copies her sister Chen Hua Chang aka Debbie Chang on the email which contains attachments of photographs of KZDJ incorporation papers with the message, "Mr. Chang Enclosed please find the company documents for KZDJ, INC."  The email chain in which Debbie is copied contains privileged email conversations between Chang, Xiaolan and Cindy from BLC.

72. Chang does not inquire who Debbie is or instruct Xiaolan to stop copying Debbie on emails containing otherwise privileged information.  Chang does not advise Xiaolan that such third party communication destroys the confidential nature of the correspondence.

73. On July 16, 2013, Chang sends an email directly to Xiaolan and does not copy Che or Cindy at BLC with the following instructions:

> "We are resending the retainer agreement for Che Li's case.
> The retainer agreement <u>must be</u> signed by Ms. Li.  Please
> have her review, sign and return to our office at her earliest
> convenience.  When returning the retainer agreement, Ms.

> Li should provide us with direct contact information
> including an email address."

74. On July 17, 2013, from STKZDJ 9485, Peide gives Check No. 107 in the amount of $5000 to Xiaolan Zhang.

75. On July 17, 2013 from KZDJ 9485, Peide gives Check No. 106 in the amount of $5000 to Xiaolan Zhang.

76.  Despite the clear directives of Che to communicate with BLC, as well as the June 17, July 1, July 8, email messages  and phone messages left for Chang by Lydia, Chang sends yet another email only to Xiaolan at Xiaolan88zhang@aim.com even though Chang acknowledging in his July 16, 2013 that his client was "Ms. Li" and Chang needed "direct contact information" for Che.

77. On July 18, 2103, again, Chang sends an email to Xiaolan only, but addresses the email:            "Dear Xiaolan and Che

> Further to your conversation with me yesterday, at your earliest convenience please forward all documentation to your USA venture *including proof that the 1 million* has been wired (proof & bank docs) as well as your tax documentation."  (Emphasis Added)

78. Again, Chang has had in his possession by his own admission since at least June 17, 2013, the information Chang was requesting from Xiaolan.  Chang referenced the Document List provided by Che in his June 17, 2013 correspondence. This Document List references bank documents and wire information of the completed transfer of $1,020,000 on April 26, 2013 into SunTrust KZDJ business checking account ending in 9485.

79. Furthermore, Che did not participate in any conversation with Chang on July 18,

2013, either in person, via telephone or through BLC.  Nor did Che ever direct that

Chang was authorized to speak to Xiaolan directly without Che.

80. On July 24, 2013, Che through Lydia sends Chang a signed Retainer Agreement,

as well as tax returns requested by Chang in the July 18, 2013 email to Xiaolan.  Chang

signs the retainer agreement on behalf of the WMC.  The retainer agreement provides

that WMC is retained for the following services:

> Step One (Form I-526/Form I-485 or IV Consulate Processing):
>
> a)    $3000 to provide fee based consulting on questions
>        and issues as the first step.
>
> b)    $12,000 when you retain us to start an EB5 case; we
>        will assist you in the feasibility period including
>        advising you about the availability of the business
>        entities to invest in.  When you decide to go
>        forward with the investment and the EB5
>        application, **we will review the investment
>        agreement and advise you about the issues and
>        documents involved**.  Finally, we will prepare and
>        file the I-526 application package to USCIS
>        (emphasis added).

81. WMC and Chang charged $3,000 to consult "on questions and issues" but failed

to return emails from Che on June 27, 2013, July 1, 2013, July 8, 2013, and telephone

calls from Lydia during the first week of July, 2013.

82. WMC and Chang charged $12,000.00 to review an investment agreement and

To advise Che about "issues involved."  However, at no time did Chang ever review or

even request an investment agreement from either Xiaolan or Che despite Chang's

knowledge as of June 17, 2013, that the investment had been <u>completed</u> by Che into a US

Company called KZDJ.

83. Lydia concludes the July 24th, 2013 email with the following instructions,

**"If you have any questions about the tax returns, please inform us a soon as possible."**  Copied on the email are Che through Lydia, Xiaolan, and ZZhang at zhangzhengang1966@126.com.

84. On July 31, 2013, Chang sends two emails to Xiaolan. Chang advises that the email will consist of two parts. The first email titled "Che Li," was sent only to Xiaolan. Chang asks again in bold print, "**As requested in our earlier email, please forward Che Li's email address and have her sign the retainer for our records**."  The remainder of the email references the tax documents sent by Lydia in her July 24th, 2013 email. Inexplicably, Chang continues to request contact information for Che and a signed retainer agreement despite referencing documents he received from Che's representative Lydia which included the executed retainer agreement from Che.

85.   Later that day, on July 31, 2013, Chang sends to Xiaolan and Che using an incorrect email for ZZhang (zhangzhengong1966@126.com) an email acknowledging that Chang received the tax documents from Lydia referenced in Lydia's July 24th, 2013 email.  Chang asks:

> "**For this process, we will need additional documentation from you to show that the funds of $1,000,000 US were transferred to a US bank and then invested in your company in the United States.**  Please ask your US Bank to provide you with a letter establishing that the investment funds were initially deposited into your personal account and then transferred to your US company's corporate account.  You should request this letter in addition to providing us with bank statements establishing the transfer of funds.
>
> **Please ask your overseas bank to provide you with a receipt and/or letter showing that the funds were transferred to a US Bank.**  We have received the Articles of Incorporation and FEIN for KZDJ, Inc., your company in the United States.  If available, please also provide us

with the signed shared certificates and confirmation regarding the First Board of Director's Meeting and/or any shareholder resolutions what have occurred since opening your business.

**Please also provide us as much documentation as possible to establish that the US Company has started operations, ie. your lease, proof of utilities, proof of purchase of supplies and/or products for your US operation, proof of purchase of shelving, cash registers, computers, etc.,** If you have begun paying salaries or entering into contractual obligations with any US company, please provide us with documentation to establish that as well.

**Eventually we will need documentation from you to establish that the entire $1,000,000.00 was invested into the US Company and spent in the US**.

We will forward an invoice for the second installment of $12,000 plus expenses in the amount of $150.00.  Please note that the filing fee for the I-526 payable to the Department of Homeland Security is $1500"

Despite sending this email again to the <u>incorrect</u> email address for Che, Chang

concludes with, "Sorry for the misunderstanding, we have your signed retainer agreement

and email contact information for you."

86. The correct address which was used by Chang on numerous occasions prior to

July 31, 2013 is zhangzhengang1966@126.com.   Again, Chang does not copy any

representative of BLC or pick up the telephone to call Che or ZZhang.  Plaintiff believe

that this email generated mail undeliverable bounceback message, which Chang failed to

resend to either Che or BLC.  In order to respond to Chang's email Xiaolan does not

"reply to all" but instead *forwards* the email to herself on July 31, 2013 before

responding to Chang at 6:22 p.m. when she writes to Chang alone,

"Hi, Sam I will send you everything by tomorrow, because we are currently waiting for the lease, and we finally got it

today.  I will forward you one copy tomorrow.  Thanks,
Xiaolan zang."

87. On August 1, 2013, Xiaolan forwards an email to Chang from Yani Xu from

Accounting Network Solutions PLC.  Xiaolan writes:

> "Hi Yanli  How are you? **our lawyer** need the information
> of the company's share, the first meeting record, and
> something you said it can be done, I have not got any feed
> back yet. can you let me know?  Thanks Xiaolan."
> (Emphasis Added)

88. Chang does not correct or clarify to either Yanli or Xiaolan that Chang does not

represent either the Xiaolan or KZDJ despite continuing to provide advice to Xiaolan,

reviewing financial documents for KZDJ and receiving checks from KZDJ.  It is appears

from this email that Xiaolan herself believes that Chang is representing Xiaolan.

Attached to the email are proposed notes purportedly from the first KZDJ meeting and

stock certificates for Che and ZZhang evidencing their ownership of KZDJ.

89. On August 5, 2013, Xiaolan sends photographs taken and sent from an Apple

Ipad.  The photographs are sent from the email address of Peide.  The photographs depict

an April 2013 SunTrust Bank Statement that shows Che's $1,020,000.00 investment

deposited on April 26, 2013 into STKZDJ 9485.  However, the bank statement also

shows that the *entire* $1,020,000 was immediately removed and placed into MMA 9337.

Also included in the email, are photographs of a falsified signature card dated March 11,

2013 which purports to add Xiaolan and Guizhi Yuan to the STKZDJ9485, and a letter

from Lisa Zuckerman of SunTrust Bank and wire information regarding Che's

investment.   The documents appears to have both ZZhang and Che's signature however

the original SunTrust documents only contain the signatures of ZZhang, Qing, and Peide.

Che was still in China on March 11, 2013.  Neither Che or ZZhang are copied on the email.

90. For reasons unknown, Chang makes no attempt to verify these documents with Che, ZZhang or BLC even though the documents were provided by Xiaolan, benefit only Xiaolan and come from Peide's IPad.  Moreover, the bank statement provided by Xiaolan shows that on the <u>same day</u> that Che and ZZhang wired $1,020,000 to the STKZDJ9485, $1,020,000 was removed from 9485 leaving a balance of only 58.00.  Had Chang immediately sent these copies of these documents to Lydia as Che had requested on several occasions, the forgeries would have been discovered and Che and ZZhang would have known that their $1,020,000 investment had been removed from the only authorized business account of KZDJ.  Furthermore, Chang failed to question the authenticity of the SunTrust documents which Che purportedly executed on March 11, 2013.  However, Che was not in the United States on March 11, 2013.  Che traveled for the first time to the United States in October of 2013**.  Chang failed to communicate or advise Che or ZZhang that their $1,020,000 investment had been removed on the same day it was wired.**

91. On August 6, 2013, Chang responds to Xiaolan that the 2nd Installment of $12,000.00 is now due.  This email was sent to Xiaolan and, again, Che's incorrect email.  Again, no attempt was made resend the email to either Che's correct address, ZZhang or BLC.

92. Despite having numerous exchanges with Lydia and Che, and after

receiving bounced back, which Chang admits to receiving by later requesting a correct email for Che, Chang still does not send his questions concerning Che's EB5 investment to BLC, or call either ZZhang, Che or Lydia.

93. Peide and Xiaolan continue to use Che and ZZhang's investment as their own personal piggy bank without restraint. On August 7, 2013, from STKZDJ 9485, they send Check No. 116, to the IRS $500 for Xiaolan Zhang's personal taxes.

94. On August 7, 2013, instead of replying to all, Xiaolan responds to only to Chang, "Hi Sam the 2nd payment will be on the way today, enclosed please find the signed documents.  Thanks  Xiaolan." Attached to the email are documents prepared by Yanli that were executed on June 20, 2013, by ZZhang, however neither Che or ZZhang signed these documents.  These documents were never presented to either Che or ZZhang for signature.  Neither Che or ZZhang was in the United States on June 20, 2013.

95. August 8, 2013 at 7:49 a.m: Chang sends an email to Xiaolan only.  Chang specifically addresses the $1,000,000 that is missing.   Chang asks:

> "At the time of your initial Board Meeting, it is stated that a bank account would be opened with Bank of America for the corporation.  Was the account opened?  **Has the $1,000,000.00 been transferred there?  The documents we have show that the funds were transferred from your Chinese bank to SunTrust, but they were then withdrawn from SunTrust.  Where is the money now?**  Please send us bank statements from May, June, July and August, showing where the money is and provide receipts showing how the money has been invested in the business so far."

96. On August 8, 2013 at 10:37 a.m Xiaolan responds, "We have never opened any account in bank of America, our account t is always with Suntrust.., and the fund is still in Suntrust.  I will email you monthly statement."

97. August 8, 2013 at 10:49 am Chang sends another email only to Xiaolan that has additional paragraphs with questions specifically for Che. Chang also writes:

> "We have completed the draft I-526 *with the information in your file*. Please review the form and provide us with a phone number for KZDJ. Please also answer Part 3 "your total capital investment in the enterprise to date."

Attached in Chang's handwriting is a draft I-526 which states that the address of KZDJ is *Xiaolan's home* and the telephone number for the company is (202) 679-0039, *Xiaolan's number*. Next to the telephone number Chang writes "manager." Chang states the Che's total capital investment is $1.85 million and that the remaining funds in the KZDJ account are $650,000. There is no other reference or explanation of where Chang got the numbers.

98. According to bank records through and including July 31, 2013, STKZDJ9485 had only **$65,071.47 not $650,000.00 as Chang misstates in his draft**. Moreover, Che's investment was split between three different accounts. SunTrust Account 9337 ("KZDJ9337") had a balance of **$400,107.19** and SunTrust Account 8211 and 6325 ("ZYD8211" and "ZYD6325") had a combined balance as of August 12, 2013 **$798,058.71**. These accounts were all opened by Peide who was an officer of both ZYD and KZDJ without permission, knowledge or authorization by the board of directors or shareholders for either entity.

99. On August 8, 2013, Chang receives check no. 117 drawn from STKZDJ9485 in the amount of $12,000 which is immediately deposited into WMC's operating account. The $12,000 fee was to include the review of the investment agreement between Xiaolan and Che, however records provided by WMC indicate that

neither WMC or Chang ever reviewed the investment agreement between Xiaolan and Che.

100.     On August 9, 2013, after Chang's request for bank statements from Xiaolan and in what Plaintiff believe is an effort to cover the removal of Che's investment from STKZDJ9485, Peide transfers $500,000 from ZYD 8211 back to STKZDJ 9485.  On August 12, 2013, the balance in the KZDJ account is approximately $767,029.94.   However for reasons unknown, Chang never obtains the bank statements or follows up with his requests for expenses.

101.     Plaintiff believe as a result of Chang's failure to advise Che of the missing funds, his failure to provide copies to BLC of the April 2013 bank statement as well as Chang's failure to obtain verification of the funds Chang repeatedly acknowledges is missing from STKZDJ9485 accelerated the theft and conversion of the EB5 investment.  On August 13, 2013, Peide transfers $450,000 to STKZDJ 9337.

102.     As of June 17, 2013, Chang knows that Che and ZZhang's investment has been in the United States since April 26, 2013 but on August 5, 2013 Chang fails to communicate his knowledge to the Plaintiff that her $1 Million Dollar investment went missing on the same day it was wired into the hands of Peide and Xiaolan.  Other than Peide and Xiaolan, only Chang had knowledge of this information and was the only person who could have provided it to Che.  Chang also had knowledge that all bank statements were being sent to Xiaolan and Peide's home yet failed to advise Che or provide Che with copies of the April 2013 Bank Statement.

103.     Chang should have appreciated that even if Che could receive copies of

the KZDJ bank statements, the language barrier would have prevented either Che or

ZZhang from otherwise learning of these unauthorized transactions without Chang's

assistance.

104.     Had Chang only communicated his concerns directly to his clients, Che

and ZZhang and demanded to see the bank statements for May, June, July and August,

receipts, Che and ZZhang's entire investment would have been saved.  However, the only

bank statements attached to Che's EB5 application show that Che's entire $1,020,000

was deposited and removed the same day.  Chang does not include any documentation as

to how the funds had been spent other than a lease for a restaurant "Zhang" that had

nothing to do with either Che's investment or KZDJ.

105.     The conversion of funds belonging to Che continues:

> August 10, 2013 KZDJ 9485, Peide gives Check No. 112,
> $12,134.18, Vannipa Smith

106.     On August 16, 2013, Xiaolan sends Chang an email requesting a copy of

Che's last two years of tax returns because the landlord wants these for the final lease

agreement. August 16, 2013, Chang responds by email that these items are in

"Xiaolan's possession."

107.     On August 17, 2013, Xiaolan by emails tells Chang,:

> "Sam not the US Tas, the documents we gave you on our
> first meet, I do not have any copy, just let me have recent
> tax or income documents to support the lease, the LL want
> it, it is better with English translation."

108.     However, according to records provided by WMC the first appointment

occurs with Xiaolan on June 14 and June 15, 2013, a time when neither Che or ZZhang was in the United States.  It appears that Chang not only met with Xiaolan and a possible third person in June 14 and June 15, without Che but also that Xiaolan did not have copies of the recent tax documents provided by Lydia to Chang on July 24, 2016.  This certainly should have been a red flag that such information was intentionally not provided to Xiaolan.

109.    Upon information and belief, Chang provided confidential documents to Xiaolan in order for Xiaolan obtain a lease for an entity that was not related to Che or KZDJ.

110.    Neither Che nor Zhang ever gave Chang or WMC permission to share or disclose the contents of these documents to Xiaolan.

111.    Upon information and belief, Chang either showed Xiaolan the documents or alternatively gave her copies after Xiaolan told Chang that the "landlord needed them."

112.    The lease at issue had nothing to do with the business proposal in Che's EB5 application. Rather, the lease was for an unrelated restaurant that Xiaolan and Peide Yan were opening under the name of KZDJ and with the money Peide Yan had absconded from the KZDJ SunTrust Account 9485.

113.    Upon information and belief, the "landlord" had knowledge of Xiaolan's past financial misconduct and was reluctant to offer a lease to KZDJ, unless other investors were involved.

114.    Upon information and belief in order to "prove" that KZDJ had other owners, Xiaolan showed confidential documents obtained through Chang to the landlord to procure a lease for a restaurant that Che knew anything about.

115.    Che's EB5 application mentions nothing about a restaurant in the business proposal included as an exhibit to the EB5 or in the cover letter Chang prepared. Nonetheless, Chang attached as Exhibit 6 to the EB5 application a lease *for Zhang restaurant* which he knew or should have known had nothing to do with the EB5 application.

116.    The lease attached as Exhibit 6 is fraudulent on its face.   The lease is not signed by ZZhang or Che, and falsely states that KZDJ's owners were ZZhang (50%), Qing (25%), and Peide Yan (25%).  Chang knew at all times relevant to this complaint that the only owners of KZDJ were Che and ZZhang

117.     For reasons unknown, Chang not only filed a lease that had nothing to do with the EB5 of his clients, but Chang also filed as Exhibit 2 to the EB5 application a corporate resolution and incorporation documents that show that KZDJ is owned by 20% by Zhang and 80% by Che.  Such a discrepancy certainly would expose Zhang and Che to unnecessary scrutiny and further damage their ability to obtain permanent residency. As a self-proclaimed expert in his field, Chang should have know how important consistency is in documents attached to EB petitions.

118.     Upon information and believe, Chang and WMC knowingly or recklessly, aided and abetted, Peide, Qing, and Xiaolan obtaining a restaurant lease with confidential information submitted by Zhang and then compromised the EB5 application by attaching a restaurant lease and inconsistent ownership documents as exhibits to the EB5 application.

119.     Alternatively, Chang and WMC had knowledge that a restaurant lease was

signed by officers of KZDJ without the authorization of Che and ZZhang, and against their interests and failed to advise Che or provide copies to Che.

120.    On September 20, 2013, Xiaolan provided to Chang a restaurant lease which obligates KZDJ to pay rent for the restaurant is $144,000 per year in equal monthly installments of $12,000.  Moreover on Page 2, (c)(2), the lease states that KZDJ deposited Ninety-Five Thousand Eight Hundred Eighty Dollars ($95,880.00) as security for the landlord and also Fifteen Thousand Nine Hundred Eighty Dollars ($15,980.00) for the first month's rent and other operating costs.

121.    Furthermore, Xiaolan is the only person listed on the lease to receive notice and that notices were to be sent to her home.  Chang knew or should have known that Che could not and did not receive notice or copies.

122.    According to the Lease, Chang and WMC had knowledge that on September 20, 2013, Xiaolan withdrew a total of $111,860.00 from the KZDJ SunTrust account to fund a completely unrelated entity in furtherance of a completely unrelated business purpose.

123.    Unbelievably, Chang and WMC did not provide any of the Lease documents to Che, ZZhang or BLC until March, 2015 nearly 18 months after receiving the documents from Xiaolan.

124.    Chang and WMC received yet another lease from Xiaolan executed on behalf of KZDJ dba AB.  On page 1 of ALB lease, rent for the store is listed as $100,000 per year payable in 12 equal monthly installments of $8,333.33.  Paragraph 2(c)(2) the lease states that the KZDJ paid a $50,000 deposit and first month's rent of $8,333.33.

125.    At no point before or after receiving the leases for Zhang restaurant or

ALB did Chang contact either Che or ZZhang regarding the material misstatements on the lease, the missing $1,000,000 investment or bring to their attention that in order to secure both leases, Peide wrote checks in the amount of $170,193.33 ($111,860 + $58,833) from the STKZDJ9485.

126.     Plaintiff believe that Chang's failure to requests bank statements or other supporting documentation from Xiaolan emboldened Xiaolan and Peide to accelerate the conversion of KZDJ funds for their own benefit and obtain commercial leases for their alterego entities because Chang and WMC appeared uninterested in protecting Che's investment.

127.     October 7, 2013, Che met with Chang for the first time since signing the retainer agreement with WMC.  Che and ZZhang met with Chang personally but again Chang failed to inform them of the missing funds, failed to provide copies of any documents given by Xiaolan to Chang, failed to advise Che that Xiaolan had withdrawn $170,193.33 in one day from the STKZDJ 9485 as security deposits for commercial leases for two entities.  Specifically, Chang also failed to provide the lease agreements for Zhang and ALB, the SunTrust Bank Statements, Signature Cards, Corporate Resolutions, or any other document provided by Xiaolan purportedly on behalf of Che. Chang failed to mention that Chang had discovered on August 5, 2013 that Xiaolan and Peide had removed the $1,020,000 from KZDJ 9485 business account.

128.     Because Chang and ZZhang were unaware of all of these transactions and because they had just met with Chang who advised that nothing was amiss and Chang would contact them if Chang had any concerns, on October 16, 2013, Che and Zhang wired another $163,934.40,in order to purchase a property owned by Ephraim Zoltinsky

at the request of Xiaolan and Peide who advised that the building purchase would be a lucrative investment.   ZZhang also gave $23,586 in cash to Xiaolan toward the down payment.

129.     Instead, Xiaolan and Peide kept the money and charged over $131,146.80 worth of merchandise on ZZhang's credit card.  Had Che and Zhang known of the numerous unauthorized transfers and that their $1,000,000 was missing and misspent, they never would have wired more money to Xiaolan and Peide to purchase a commercial building. The total loss on this building $318,667.20.

130.     Unfettered and without oversight, Peide and Xiaolan continue to use KZDJ funds for their own benefit:

> August 27, 2013 KZDJ 9485,
> Check No. 119, $8,409.75, Vannipa Smith
>
> August 28, 2013 KZDJ 9485,
> Check No. 122, $42,150 to ZYD, Inc.
>
> September 12, 2013, KZDJ 9485
> Check No. 124, $9,000 to Zandy
>
> September 19, 2013 KZDJ 9485
> Check No. 83, $2000 to ZYD, Inc.
>
> September 20, 2013, KZDJ 9485
> Check No. 135, $4,194.86 to Zandy
>
> September 22, 2013, KZDJ 9485
> Check No. 134, $2,400 to Zandy
>
> September 22, 2013, KZDJ 9485
> Check No. 133, $200,000 to ZYD
>
> October 4, 2013, KZDJ 9485
> Check No. 145, $4089.86, Vannipa Smith
>
> October 4, 2013, KZDJ 9485
> Check No. 143, $7909.75 to Vannipa Smith

October 10, 2013, KZDJ 9485
Check No. 149, $2000 to Xiaolan Zhang

October 12, 201 KZDJ 9485,
Check No. 125, $7,998 to Vannipa Smith

November 11, 2013, KZDJ 9485
Check No. 173, $5000 to Zandy Inc.

November 12, 2013, KZDJ 9485
Check No. 165, $20,000 to Zandy, Inc.

November 22, 2013, KZDJ 9485
Check No. 173, $5,000 to Zandy Inc.

December 7, 2013, KZDJ 9485
Check No. 187, $2000 to Zandy, Inc.

December 7, 2013 KZDJ 9485
Check No. 182, $5000 to Guizhi Yuan

December 8, 2013 KZDJ 9485
Check No. 181, $5000 to Guizhi Yuan

December 27, 2013 KZDJ 9485
Check No. 259 $1000 to Xiaolan Zhang.

131.     November 19, 2013, Chang and WMC filed the EB5 application, but

didn't notify Che that it had been filed nor did Chang and WMC provide Che with a copy

of the filed application.

132.     December 9, 2013, Lydia, emailed Chang and asks for a status of the EB5

application that had been filed on November 19, 2013.  Instead of providing a copy to

Che or Lydia, Chang responds that "A copy of the USCIS receipt (with case number) was

emailed to Xiaolan Zhang." Instead of sending it directly to Lydia via email or first class

mail, Chang only states that the EB5 application was given to Xiaolan but does not send a

copy to Che, ZZhang or Lydia.

133.     Without restraint, Xiaolan and Peide, have used resources belonging to KZDJ to fund and open businesses in Virginia owned or operated by family members or friends.

134.     From the date ALB opened in November of 2013, Peide and Xiaolan drained not only the capital, the profits and the merchandise, but bank records show that money from KZDJ was used to fund other entities owned or operated by Xiaolan and Peide.

135.     Over the next 18 months, Chang and WMC choose only to communicate with Xiaolan and did not communicate at all with Che, ZZhang or BLC.  Che was not notified when Chang had concerns that KZDJ was not maintaining 10 full time employees or other concerns Chang had regarding the business operation of KZDJ.

136.     Chang and WMC continued to review and provide comments for monthly operating reports of KZDJ provided by Xiaolan.

137.     On April 1, 2014, Xiaolan and Guizhi defaulted on their stock purchase agreement.

138.     Despite several forbearance agreements, Xiaolan and Guizhi were never able to provide money toward the stock purchase of KZDJ.

139.     In October, 2014, Guizhi asked ZZhang for $30,000 to prevent the Landlord from evicting ABL.  ZZhang had no idea that KZDJ was unable to pay its bills.  ZZhang gave Guizhi $30,000 in cash to prevent eviction.

140.     Fearing the worst, ZZhang and Che stayed in the United States longer than

Expected keeping a closer eye on the store.  ZZhang observed unusual business practices by Xiaolan and other employees such as failing to account for merchandise, not ringing up sales, or removal of items from the store.

141.     January 6, 2015 and January 15, 2015: Che and ZZhang met with Chang in his office to discuss their concerns and also to review the files.  However, all the files were in English and again, Chang did not provide a copy of the EB5 application.  ZZhang and Che approached Chang about investigating the actions of Peide, Xiaolan and Guizhi.

142.     For reasons that remain unclear, Chang, rather than conduct an investigation himself, referred ZZhang and Che to Jonathon Ai, a friend of his Chang's son Richard, who had an office close to ALB in Rockville, Maryland.

143.     Over the course of two months,  Ai discovered numerous fraudulent conveyances and suggested that Chang file suit to recover money that was held by various co-conspirators.  Chang received Ai's written report and does nothing.  In email correspondence with Chang, Ai requests Chang's assistance in providing email addresses for Peide and Xiaolan.   Chang, despite having these email addresses at his fingertips fails to assist Ai by providing any email addresses per Ai's request and fails to provide English translation of the Ai's reports to Che.

144.     March 16, 2015, Chang finally provides a copy of the filed EB5 application to Che – fourteen months *after* it had been filed.  Again, in English with no translation attached or offered.

145.     March 16, 2015, ZZhang and Che engage William Cowden, Esquire, of the Federal Practice Group to assist with the filing of criminal charges against Xiaolan Zhang.

146.     On or about April 4, 2015, ZZhang at the direction of Cowden seizes the inventory of KZDJ and takes the inventory to secure storage facility.

147.     On or about May 11, 2015, Xiaolan derivatively on behalf of KZDJ sues ZZhang.

148.     ZZhang and KZDJ file counter claims against Xiaolan, transferees of property belonging to KZDJ, and co-conspirators.

149.     Litigation continues with Jury Trial pending on July 18, 2016.

150.     To date, ZZhang and Che have spent over $200,000 in legal fees as a result of litigation with Xiaolan over the ownership of KZDJ as well as the recovery of funds belonging to KZDJ.

151.     On or about June 20, 2015, undersigned counsel receivesd the EB5 Application filed on Che's behalf and discovered numerous misstatements, forgeries and inconsistencies.

152.     Chang filed the EB5 with no other bank statements other than the April, 2013 bank statement that showed that $1,000,000 investment was immediately removed on the same day that Che wired the money from China leaving a balance of $58.00. Chang filed the EB5 without a single receipt, cancelled check or other evidence which shows how the $1,000,000 was spent.  Chang also filed the EB5 with inconsistent documents and stock shares Chang knew were drafted by Xiaolan.  Chang filed the EB5 with a lease agreement for a restaurant purportedly owned by KZDJ but never mentioned in Chang's cover letter or the business proposal attached to the EB5.

153.     Worst of all, Che and ZZhang discovered that according to the business

proposal attached to their EB5, reviewed and incorporated into the cover letter written by Chang,  "American Luxury Boutique is *organized as a partnership* by Xiaolan Zhang." According to the management summary, "We would like to introduce Miss Xiaolan Zhang at this time as our marketing and vision steward.  Miss Zhang is a George Washington University graduate, which started and operated her own high end gift boutique in the metro Washington DC area for over a decade and one half.  Miss Zhang sold her store realizing a very profitable return."

154.     According to this business proposal, Chang had knowledge despite Chang's failure to review any investment agreement, that Xiaolan was asserting an ownership interest in KZDJ as a partner of ALB.

155.     It also appeared from the numerous mistakes found in the EB5 that Chang had put himself in a highly conflicted position by which Chang relied exclusively on information provided by Xiaolan who had a competing interest with Che and that Chang represented both seller and purchaser of KZDJ stock or alternatively both parties to a contract.

156.     Not only was Chang providing legal advice to Xiaolan, Chang did not disclose to Che that Xiaolan was asserting that Xiaolan had a partnership interest in ALB.

157.     On May 15, 2015, Che and ZZhang were shocked to find out that Xiaolan was suing ZZhang on behalf of KZDJ for losses of $1,500,000 and compensatory damages of $75,000.00 in the case styled *Xiaolan Zhang vs. Zhengang Zhang*, Case No. 405357.

158.     Xiaolan alleged "I reside at 405 Great Falls Road, Rockville, Maryland

20850.  I own 50% of KZDJ's stock." "On May 11, 2015, Michelle transferred her 25%

ownership interest to me, making me a 50% owner of KZDJ."

159.     Xiaolan also requested an attachment before judgment based upon

ZZhang's Chinese citizenship and that ZZhang was in the United States on a 6 month

Visa which expires on May 22, 2015.

160.     Upon learning of the lawsuit, ZZhang retained attorneys licensed in

Maryland and was forced to stay past his exit date to defend the lawsuit.

161.     Che's Maryland Counsel was able to obtain a copy of the EB5 and had the

same translated for ZZhang and Che.

162.     Upon learning of the material misrepresentations made in the EB5,

ZZhang in July 10, 2015, demanded the same be withdrawn:

> "Dear Attorney Zhang, Please withdraw my EB5
> Application immediately.  My attorney, Christina
> Hamilton, has shown me documents as exhibits for the EB5
> petition that I did not authorize and do not bear my
> signature.  The lease submitted, I never approved.  It is for
> a restaurant named Zhang.  Also, the Lease has an exhibit
> that says I am 50% owner of KZDJ.  This is wrong.  The
> exhibit from Suntrust is falsified. Xiaolan Zhang has never
> been an officer of KZDJ.  The actual bank records my
> attorney will send.  Will you also sign an affidavit and
> email to me that I did not provide the documents you
> attached to the EB5 application and the documents were
> provided by Xiaolan Zhang.  Please copy my attorney
> Christina Hamilton on all correspondence**.  Please also
> provide me with all communications made between
> your office, yourself and Xiaolan Zhang**."

Chang did not provide the affidavit or any communications as requested.

163.     In Chang's self-serving response dated July 13, 2015, Chang omits critical

facts as well as diminishes the role Chang's negligence played in the loss of the

investment funds:

Dear Mr. Zhang:

We have received your request to withdraw the EB-5 petition. Since your wife was the applicant, we will need written authorization from her confirming she no longer wishes to process this case and requests it to be withdrawn. Please ask Che Li to send us her signed confirmation today. Once we receive it, we will request users to withdraw her petition immediately.

We are surprised to hear that the Suntrust Bank documentation is fraudulent.  Since you and your wife first consulted with us at our office on January 6, 2015 and January 15, 2015 to let us know of your suspicions regarding Shelly's (your Operations Manager and Representative) activities and the whereabouts of your invested funds, we have worked closely with you to review and discuss the validity of your EB-5 petition, as well as the possible courses of action for recovering your money.

We provided you with the names of two (2) lawyers who could help you with the investigation into the location of your funds: Joseph Loynott III and John Ai. You advised us that you selected John Ai to help you because he could communicate with you in Chinese.  In addition to your file review in our office, we forwarded you and your wife a complete copy of the EB-5 petition with all exhibits, including the bank statements and the lease, on March 16, 2015.

However, it was not until July 10, 2015 that we were made aware that you feel these documentations are fraudulent.

Once we receive Che Li's confirmation, we will be able to discuss the entire matter with her further as she is the EB-5 applicant.

164.     With the assistance of a translator and ZZhang, undersigned counsel

reminded Chang that Chang had failed to have both the SunTrust documents and the

lease translated into Mandarin and pointed out for Chang that the EB5 was inconsistent

on its face and the documents Chang provided were at odds with the ownership of KZDJ,

the business plan Chang provided, and most importantly referenced a restaurant business

Che knew nothing about it.

165.     In addition to losing their investment, Che and ZZhang spent over

$200,000 in attorneys fees litigating against Xiaolan Zhang and her co-conspirators.

166.     As a result of Xiaolan and Peide's Ponzi Scheme KZDJ lost

approximately $980,000 in funds transferred out of KZDJ bank accounts into various

entities related to Xiaolan.

167.     On or about January 5, 2016, despite repeated requests for copies of

correspondence and Che's complete file, WMC represented by Peter Kahn, Esq.,

provided documents to Che but advised, "We have also withheld seveal documents from

one fo the files that constitute internal WMC work product, not work performed on

behalf of your clients."

168.     Che reviewed the documents and discovered the correspondence between

Xiaolan and Chang.  Che continued through counsel to demand her complete file but to

this date Che does not believe that WMC has provided all of Che's documents.

169.     To the extent that any statute of limitations may otherwise be applicable to

case, the Defendant's actions prevent its application.  As alleged above, despite repeated

requests and even in person requests for the complete file, WMC and Chang concealed

and withheld documents and correspondence with Xiaolan which allowed Xiaolan to

continue to conceal Xiaolan's scheme to defraud Che of her EB5 investment.

170.     The Plaintiff even through the exercise of reasonable diligence, could not

have discovered the existence of this fraud, therefore to the extent applicable all statute

of limitations are tolled under the discovery rule.

171.     Because the Defendants fraudulently concealed this facts, all applicable statutes of limitations have been tolled.

## COUNT I – NEGLIGENCE/MALPRACTICE

172.     Plaintiff realleges and incorporate herein by reference the allegations contained in the above-referenced paragraphs 1-171.

173.     Having been engaged by Che to provide services as legal counsel to represent their interests, WMC and Chang had a duty to exercise care and skill to comply with accepted and reasonable standards of care ("standards of care") for performing such services.

174.     WMC and Chang failed to comply with the standards of care and failed to competently represent Che.

175.     WMC and Chang failed to exercise a reasonable degree of care and skill in the performance of their duties.

176.     WMC and Chang failed to exercise the skill and knowledge ordinarily possessed by attorneys under similar circumstances.

177.     WMC and Chang failed to timely mitigate damages caused by their own actions.

178.     Specifically, among other breaches, WMC and Chang:

    a.     Failed to provide translations of any communications it had with Xiaolan to Mandarin;

    b.     Failed to communicate on a regular basis with Che and her designated representatives through the translation service Bright Life China

    c.     Failed to provide critical documents provided by Xiaolan to Che

      d.       Failed to notify Che that the investment money was removed from the KZDJ 9485 account on the same day it was wired;

      e.       Filed Che's EB5 Petition with glaring inconsistencies, fraudulent signatures, a commercial lease for another business, a business bank account reflecting a balance of $58.00 without any monthly bank statements or documents substantiating the use of the funds for the designated EB5 investment.

      f.       Failed to reasonably represent Che in all matters concerning the EB5;

179.      WMC is liable for the lack of such skill, care, and diligence as those of the legal profession commonly possess and exercise in such matters of professional employment.

180.      WMC is liable for the actions of its partner/agent, Chang.

181.      The actions by Chang and WMC in filing an EB5 Petition that subjected Che to possible sanctions from USCIS for filing false and misleading documents necessitated the immediate withdrawal.  Despite the fact that Chang knew or should have known that ALB closed on April 2, 2015, Chang and WMC did nothing to mitigate or intervene on behalf of Che.

182.      As a direct and proximate cause of Chang and WMC's numerous breaches of duties owed to her, Che loss the chance to operate a successful regional center and Che lost a lucrative business opportunity.

183.      As a direct and proximate result of one or more of the acts or omissions stated above, Che has sustained damage of approximately $1, 318,667.20 plus over $200,000 in litigation expenses, and damages resulting from the withdrawal of the EB5 in an amount to be determined at trial.

## COUNT II – BREACH OF FIDUCIARY DUTY

184.     Plaintiff realleges and incorporate herein by reference the allegations contained in the above-referenced paragraphs 1-183.

185.     WMC and Chang owed fiduciary duties to their client Che and to KZJD as a third party beneificary.

186.     WMC and Chang owed fiduciary duties of care and loyalty to Che and also KZDJ by virtue of the retainer agreement executed by Che, ancillary services provided to KZDJ, the review of bank records belonging to KZDJ, and the acceptance of stock certificates purportedly signed by Che.

187.     WMC and Chang owned a duty of care to both Che and KZDJ to refrain from engaging in grossly negligent or reckless conduct including their repeated failures to disclose to Che facts a reasonable person in similar circumstances would want to know including but not limited to the following:

    a.  That on April 26, 2016, Che's entire $1,020,000 investment was removed from the KZDJ 9485 business checking account.

    b.  That Xiaolan failed to produce monthly bank statements, canceled checks or proof of expenses regarding the EB5 investment.

    c.  That all bank statements were being sent to the home of Xiaolan and Peide.

    d.  That KZDJ was in danger of losing its regional center status by failing to employ 10 full time employees.

    e.  That Qing Yuan and Peide had signed a lease on behalf of KZDJ for ALB which would require monthly payments of $8,333.00

    f.  That Qing Yuan and Peide had signed a lease on behalf of KZDJ for Zhang restaurant which would require KZDJ to make monthly payments of $12,000.00.

    g.   That the Landlord was holding over $150,000 of KZDJ funds as a security deposit for both ALB and Zhang restaurant.

    h.   That Xiaolan was holding herself out as a partner of KZDJ and was claiming an interest in the company.

188.    WMC and Chang owed Che a duty of loyalty which included at a minimum to refrain from representing or providing legal advice to Xiaolan who had an interest adverse to Xiaolan as well as KZDJ.

189.    WMC and Chang knowingly or recklessly facilitated the commingling of Che's EB5 investment causing such funds to be improperly transferred for the personal use of Xiaolan or for the benefit of third parties affiliated with Xiaolan.

190.    WMC and Chang knowingly concealed their knowledge of the unauthorized transfers to Che and thereby facilitated Xiaolan's ability to continue her fraudulent scheme until virtually all KZDJ's funds were transferred to other financial institution or to the accounts of entities affiliated with Xiaolan.

191.    WMC and Chang's numerous breaches of the fiduciary duties directly enabled Xiaolan to make these transfers because the only individual who had knowledge of these transfers other than Xiaolan and Peide, was Chang.

192.    The damage done including monies lost and opportunities destroyed as a result of the Defendants' breaches of their duties of care, loyalty, competency and diligence are a foreseeable consequence of their actions and omissions.

193.    As a direct and proximate result of one or more of the acts or omissions stated above, the Che has sustained damages from the loss of her investment in the amount of $1,318,667.20. plus approximately $220,000 in attorneys fees and costs of litigation.

43

194.     According to the business proposal that the Defendants attached to the EB5, projected sales for ALB were estimated to be $4,995,000 FY 2014, $8,160,000 FY 2015, and $9,000,000 FY2016.  Profit for ALB was estimated to be approximately $1,200,000 FY2014, $3,000,000 FY2015, and $3,500,000 FY 2016.

195.     As a result of the Defendants intentional or reckless failures to communicate, inform, or provide critical financial information regarding the conversion of funds belonging first to Che and then from KZDJ, the Defendants facilitated the transfer of hundreds of thousands of dollars of merchandise across international lines using financial institutions to fraudulently wire money from China and to China solely for the benefit of Xiaolan and Peide's Ponzi scheme.

196.     Xiaolan and Peide sold to Che unregistered interests in a company and used the money for their own personal gain.

197.     WMC and Chang aided and abetted Xiaolan fraudulent scheme through its negligence in failing to disclose materially relevant information from Xiaolan which had numerous badges of fraud but failed to act or notify Che.  Instead, when Ai asked for email addresses for Xiaolan and Peide to assist investigators hired by Che, Chang chose instead to protect himself and Xiaolan.

198.     As a result of the fraudulent leases facilitated by Chang and WMC, KZDJ lost a security deposit of $150,000 and also paid over $160,000 for the lease of the Zhang restaurant which never opened.

199.     KZDJ has sustained losses of approximately $980,000 in unauthorized transfers in the first year of operation alone with total damages in amount to be determined at trial.  The collapse of KZDJ was a foreseeable consequence of the financial

misconduct committed by Xiaolan and Peide which remained undetected with the knowledge or assistance of WMC and Chang who knew that Xiaolan and Peide removed the $1,000,000 from the KZDJ bank account.

## COUNT III BREACH OF CONTRACT

200.     Plaintiff realleges and incorporate herein by reference the allegations contained in the above-referenced paragraphs 1-199.

201.     Plaintiff entered into a binding legal services agreement on July 24, 2013. The Defendants promised that in exchange for receiving $3,000 and $12,000 respectively, that Defendants would be available for consultation to answer questions and also Defendants promised to advise and review the investment agreement to identify potential issues or concerns.

202.     Defendants were not available for consultations and instead chose to communicate their concerns with Xiaolan instead of Che.

203.     Defendants breached the legal services contract by failing to review the investment agreement, failing to advise Che of their concerns that KZDJ did not have 10 fulltime employees and failing to provide competent representation.

204.     Defendants are strictly liable for their failures to perform these acts despite Che's timely payment of both $3,000 and $12,000 installments.

WHEREFORE, Plaintiff prays for judgment and relief on their causes of action as follows and as is appropriate:

A.      Judgment entered against WMC and Chang for an amount to be

determined at trial but anticipated to be in excess of $3,000,000;

B.      Costs of this suit, including reasonable expert fees;

C.      Pre- and post-judgment interest; and

D.      Such other and further relief as this Court may deem necessary or

appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury and all issues so triable.

### Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated:  July 21, 2016                           Respectfully submitted,


EISLER HAMILTON, LLC


By:   /s/ Maria Christina Hamilton
       Maria C.G. Hamilton, Bar No. 16484
       Alan D. Eisler, Bar 11524
       6110 Executive Blvd., Suite 230
       Rockville, MD 20852
       Phone: (240) 283-1163
       Fax: (240) 283-1179
       Email:mcghamilton@gmail.com,
       aeisler@e-hlegal.com
       Attorneys for Li Che and KZDJ