IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LI CHE,

    Plaintiff,

  v.                                 Civil Action No. PX 16-2665

HSIEN CHENG CHANG and
WASSERMAN, MANCINI & CHANG, PC,

    Defendants.

\* \* \* \* \* \*

## MEMORANDUM OPINION

Pending in this legal malpractice action is Defendants' motion to dismiss or, in the alternative, for summary judgment (ECF No. 13). The issues are fully briefed and a hearing was held on Tuesday, July 11, 2017. For the reasons stated below, Defendants' motion is granted in part and denied in part.

## I.    BACKGROUND[1]

In the fall of 2012, Plaintiff Che Li ("Plaintiff") and her husband Zhang Zhengang ("Zhengang"), both of whom are Chinese citizens, decided to immigrate to the United States through the EB-5 Immigrant Investor Program offered by the United States Citizenship and Immigration Services ("USCIS"). Under this program, foreign entrepreneurs are eligible to apply for naturalization if they invest in a United States based commercial enterprise which creates or preserves ten permanent full-time jobs for qualified United States workers. The investment must meet certain requirements, to include the immigrant investor placing her investment "at risk" for the purpose of generating a return.

---

[1] The facts are taken from the amended complaint and from exhibits attached to it.

In October 2012, Zhengang traveled from China to Florida to find a suitable investment for a potential EB-5 petition. While there, Zhengang met several individuals from Zhengang's and Plaintiff's native Chinese province of Shandong, including Qin Yuan ("Qing"), her brother Hongtao Yuan ("Hongtao"), and their sister Guizhi Yuan ("Guizhi") (collectively, "the Yuans").[2] The Yuans advised Zhengang that EB-5 projects in the Washington, D.C. area were more lucrative than those in Florida because they produce higher rates of return more quickly.

The Yuans then invited Zhengang sightseeing in Washington, DC. Zhengang accepted and so he, along with Qing and Guizhi, embarked on a journey to the nation's capital. Both before and during their trip to Washington, Qing and Guizhi spoke highly of a wealthy D.C. couple, Xiaolan Zhang ("Xiaolan") and Peide Yan ("Peide"), who were operating successful businesses that could potentially serve as qualifying EB-5 investments. Qing and Guizhi brought Zhengang to Xiaolan's home in Rockville, Maryland, where Zhengang stayed for several weeks.

During Zhengang's stay with Xiaolan, Xiaolan informed Zhengang that she owned a lucrative luxury goods store. *See* Amend. Compl., ECF No. 6 at 6. In reality, according to Plaintiff, Xiaolan was not successful at all, but the mastermind of a fraudulent scheme involving the use of individuals' credit cards to purchase inventory at high-end department stores and then resell the purchases at a discount. *Id.* at 6–7. Xiaolan allegedly used the profits for her personal gain and also to repay earlier victims who were threatening to file criminal charges.

Over the course of Zhengang's visit with Xiaolan, Xiaolan convinced Zhengang to invest in another luxury goods store to be opened in Washington, D.C. as a way for Zhengang and Plaintiff to satisfy the EB-5 investment requirement. Accordingly, on November 5, 2012, Zhengang, individually and on behalf of Plaintiff, incorporated KZDJ in Virginia with its stated

---

[2] According to Plaintiff, the Shandong Province is a relatively remote area of China where family ties to the Province often serve as bona fides before business relationships can actually be developed.

corporate purpose as operating a luxury goods store. KZDJ Articles of Incorporation, ECF No. 6-1 at 21. Xiaolan and Guizhi agreed to manage the store while Zhengang and Plaintiff agreed to fund the enterprise with a $1 million investment to KZDJ. This capital would satisfy the investment requirement of the EB-5 petition.

Around November 7, 2012, Zhengang designated Qing as KZDJ's vice president and Peide as its secretary. Zhengang then opened a business checking account with SunTrust Bank ("KZDJ SunTrust 9485") by corporate resolution signed by all three KZDJ officers. *See* ECF No. 6-1 at 24–27. Zhengang then returned to China.

On or about March 10, 2013, Plaintiff asked Zhengang to travel to the United States to discuss the EB-5 petition with Sam Chang ("Chang"), an immigration attorney Guizhi and Xiaolan had recommended to Zhengang during his initial visit to Washington. *See* Amend. Compl., ECF No. 6 at 9. Zhengang obliged and, once again, left for the United States. On or about March 11, 2013, Xiaolan took Zhengang to Chang's office at Wasserman, Mancini & Chang, PC ("WMC") to discuss the EB-5 petition requirements.[3] *Id.* Because Zhengang could not read, write, or speak English, all discussions were in Chinese.

After speaking with Chang about the EB-5 petition process, and upon Chang's advice, Zhengang, Plaintiff, Xiaolan, and Guizhi entered into an investment agreement titled "DC Duty Free Store" related to the opening of the luxury goods store. ECF No. 6-2 at 1–4. To assuage Zhengang's and Plaintiff's concerns regarding the riskiness of the investment and the amount of money they were being asked to invest, the parties' agreement states that Xiaolan and Guizhi would pledge their homes as collateral until KZDJ could generate a profit equal to Zhengang's and Che's investment. *See* ECF No. 6-2 at 3. Neither Zhengang nor Plaintiff knew that this

---

[3] Chang and WMC will be referred to collectively as "the Defendants" for the remainder of this Memorandum Opinion.

provision of the investment agreement would likely violate USCIS's "at risk" investment requirement. ECF No. 6 at 11. But Plaintiff was not worried, as she relied on the attorney, Chang, to review the agreement for compliance with the immigration laws. *Id.*

Xiaolan translated the investment agreement from Chinese, *see* ECF No. 6-2 at 1–2, to English, *see id.* at 4, which was then executed by both parties. *See* ECF No. 6 at 10. According to Plaintiff, the translated document, titled "Business Agreement," is materially different than the original contract—differences that neither Zhengang nor Plaintiff noticed because they cannot read English. For example, Xiaolan's English translation states that Xiaolan and Guizhi "will cooperate with the immigration lawyer [Chang]," while the original agreement makes no mention of an immigration lawyer. *Compare* ECF No. 6-2 at 3, *with id.* at 4.

On April 26, 2013, Zhengang and Plaintiff wired $1,020,000 into KZDJ SunTrust 9485. One million dollars was the Plaintiff's EB-5 investment itself, and the remaining $20,000 was Chang's retainer fee. On the same day, Peide withdrew from the KZDJ SunTrust 9485 account roughly $1 million and used those funds to open another SunTrust checking account for KZDJ ending in 9337 ("KZDJ SunTrust 9337"). *See* ECF No. 6 at 12; ECF No. 6-2 at 6–10. Neither Zhengang nor Plaintiff knew about Peide's transfer.

On May 12, 2013, Plaintiff sent to Defendants the couple's personal information, bank records, resumes, work histories, and declarations in furtherance of her EB-5 petition. *See* ECF No. 6 at 12–13. Included in Plaintiff's declaration was a statement which reads: "Following the receipt of funds in my Standard Chartered Bank account, I applied to transfer the investment capital of $1 million to the SunTrust Bank account [ending in 9485] on April 24, 2013, and [the SunTrust Bank account ending in 9485] received my investment capital on April 26, 2013." *See* ECF No. 6-2 at 13. Two weeks later, Peide wrote a $500,000 check to himself from SunTrust

KZDJ 9337 and then transferred the funds into a separate SunTrust checking account related to the Yuan's Virginia corporation, ZYD, Inc., and on which Peide was also a signatory. ECF No. 6 at 13. Peide and Xiaolan then purportedly took what was left of Plaintiff's investment for themselves. Plaintiff had no knowledge of these transfers.

On June 14 and 15, 2013, Xiaolan visited Chang at WMC's D.C. office. Neither Zhengang nor Plaintiff was in the United States at that time. According to Chang's handwritten notes, Xiaolan told Chang that Plaintiff's $1 million investment would fund two separate businesses for Peide and Xiaolan: (1) a duty-free gift shop and (2) a pan-Asian restaurant. Both the restaurant's and the gift shop's employees would be considered in combination for the ten full-time employees needed for Plaintiff's EB-5 petition. Neither Plaintiff nor Zhengang authorized or even knew about Xiaolan's representations to Chang. *See* ECF No. 6 at 13–14.

Shortly before the June 14 and 15 meetings between Xiaolan and Chang, Taher Albeitawi, a Florida businessman, registered an entity called "American Luxury Boutique" ("ALB"). ECF No. 6 at 16; ECF No. 6-3 at 12–14. Taher incorporated ALB based upon a business proposal drafted by Chawky Jabaly, who had emailed the same business proposal to Xiaolan on April 3, 2013. ECF No. 6 at 16; ECF No. 6-3 at 15. On August 1, 2013, Peide wired from the KZDJ SunTrust 9485 account $3,000 to the Jabaly Law Trust Account. ECF No. 6-3 at 16. Taher, Xialoan, and the property management company of 800 17th Street NW, Washington, D.C. then allegedly executed a commercial lease in furtherance of the new ALB enterprise. It is unclear whether Plaintiff was aware of these transactions. *See* ECF No. 6 at 16.

On June 17, 2013, Chang emailed Xiaolan a retainer agreement for Plaintiff and requested an initial payment of $3,000 to WMC. *See* ECF No. 6 at 14–15; ECF No. 6-3 at 8–9. The email also included questions for Plaintiff and requested further documentation regarding

Plaintiff's and Zhengang's business tax returns. On June 27, 2013, Plaintiff responded to Chang's June 17 email to Xiaolan through a translation service, Bright Life China ("BLC"). Plaintiff designated Lydia from BLC as Plaintiff's agent and translator, and copied on the email was Lydia from BLC, Xiaolan, Zhengang, and another employee of BLC, Jerry. *See* ECF No. 6-3 at 10–11. Lydia sent two more emails on July 1 and 8, 2013 to Chang asking him whether he received the June 27 email and asking him to call her. ECF No. 6 at 17.

On July 9, 2013, Chang sent an email to Xiaolan and Cindy at BLC, stating:

> We have enclosed for your further handling the retainer agreement for the EB5 case. Please review, sign and return to our office with the retainer fee. Once we receive the documentation, we will finalize the review of your documentation.

ECF No. 6-3 at 19–20. On July 12, 2013, Xiaolan sent WMC the retainer agreement and a check for $3,000 drawn from KZDJ SunTrust 9485, but the retainer agreement was signed by Peide, not Plaintiff. *See* ECF No. 6-4 at 3–6. Chang accepted the retainer agreement without calling or emailing Plaintiff. WMC allegedly deposited the $3,000 check sent by Peide on July 14, 2013.

On July 15, Xiolan sent an email to Chang which contained attachments of KZDJ's incorporation papers. Oddly, the email copies a person named Debbie Chang. Defendant Chang never inquired as to Debbie Chang's relationship, if any, to Plaintiff. ECF No. 6 at 18.[4]

The next day, Defendant Chang sent another email directly to Xiaolan without copying Plaintiff or Cindy at BLC, with the following instruction:

> We are resending the retainer agreement for Che Li's case. The retainer agreement must be signed by Ms. Li. Please have her review, sign and return to our office at her earliest convenience. When returning the retainer agreement, Ms. Li should provide us with direct contact information including an email address.

---

[4] Plaintiff alleges that Debbie Chang is Xiaolan's sister, Chen Hua. ECF No. 6 at 18.

ECF No. 6 at 18–19; ECF No. 6-4 at 8. Chang then sent another email on July 18, 2013 only to Xiaolan requesting Plaintiff produce documentation regarding her investment and business venture. ECF No. 6-4 at 11.

On July 24, 2013, Plaintiff, through Lydia at BLC, sent Chang a signed retainer agreement. *See* ECF No. 6-4 at 12–15. The retainer agreement provides that WMC would provide the following services:

Step One (Form I-526/Form I-485 or IV Consulate Processing)

a)      $3,000 to provide fee based consulting on questions and issues as the first step.

b)      $12,000 when you retain[] us to start an EB5 case; we will assist you in the feasibility period including advising you about the availability of the business entities to invest in. When you decide to go forward with the investment and the EB5 application, we will review the investment agreement and advise you about the issues and documents involved. Finally, we will prepare and file the I-526 application package to USCIS.

*Id.* at 12.

On July 31, 2013, Chang sent two emails to Xiaolan, again requesting Xiaolan provide Chang with Plaintiff's email address even though Chang had already received several communications from Lydia at BLC acknowledging that Lydia is Plaintiff's representative. *See* ECF No. 6-4 at 18; ECF No. 6 at 21, as Lydia was the person who sent Plaintiff's signed retainer agreement to Chang earlier that week.

On August 5, 2013, Xiaolan emailed WMC photographs depicting an April 2013 SunTrust Bank statement allegedly showing that Plaintiff had deposited $1,020,000 into KZDJ SuntTrust 9485 on April 26, 2013. ECF No. 6 at 24. The bank statement also shows that at least $1,000,000 of her investment had been transferred to KZDJ SunTrust 9337. Also included in the email are photographs of an allegedly falsified signature card dated March 11, 2013, which

purports to add Xiaolan and Guizhi to KZDJ SunTrust 9485. Neither Plaintiff nor Zhengang were copied on this email and Chang did not attempt to verify these documents with Plaintiff, Zhengang, or BLC.

Throughout August, 2013, Peide and Xiaolan allegedly used Plaintiff's investment for their own personal expenses, and Chang and Xiaolan continued to communicate with one another without involving Plaintiff or Zhengang. *See* ECF No. 6 at 25–27. Plaintiff's complaint also alleges that Xiaolan discussed with Chang two properties that Xialoan intended to rent using Plaintiff's investment. One was a restaurant called the "Zhan Restaurant," a business unrelated to Plaintiff's investment. *See* ECF No. 6 at 29. Although this lease was unrelated to the EB-5 petition, Chang attached a copy of the restaurant lease to Plaintiff's EB-5 petition. Chang did not provide the restaurant lease to Plaintiff, Zhengang, or BLC until March 2015. *See* ECF No. 6 at 32.

Chang apparently received another lease from Xiaolan, executed on behalf of KZDJ, for the luxury store ALB. Plaintiff alleges that "[a]t no point before or after receiving the Restaurant Lease and ALB Lease did Chang contact either [her] or ZZhang [sic] or otherwise inform them of: (a) the fictitious owners listed on the leases; (b) the missing $1,000,000 investment; and (c) the [sic] Peide wrote in the amount of $170,193.33 . . . from KZDJ SunTrust 9485 to secure the leases." ECF No. 6 at 32.

On October 7, 2013, Zhengang met with Chang. Chang told Zhengang that everything was going well with the EB-5 petition and that Chang would contact him if Chang had any concerns. Chang further represented that Plaintiff could expect her conditional EB-5 visa within 45 days after the filing of the EB-5 petition. ECF No. 6 at 33. At this point, both Plaintiff and Zhengang still trusted Xiaolan and Peide. Accordingly, based on Chang's assurance that

Plaintiff's application would be reviewed soon, Plaintiff, Zhengang, and Peide entered into another business venture for a multiuse commercial building in Rockville, Maryland. On October 16, 2013, Plaintiff wired an additional $163,934.40 to Peide for the purchase of the Rockville property.

Predictably, instead of using the $163,934 to purchase the property, Xiaolan and Peide allegedly kept the money for themselves and also charged over $131,146.80 worth of merchandise on Zhengang's credit card. Plaintiff alleges she incurred a total loss involving the "Rockville property" deal of $318,667.20.

In October 2014, after hearing nothing from Defendants, both Zhengang and Plaintiff travelled to the United States to oversee their investment. They, along with Guizhi, met with Chang to discuss the status of Plaintiff's EB-5 application. At this meeting, Chang advised Plaintiff and Zhengang to remain in the United States because Plaintiff's EB-5 application would be approved in 45 days. During their visit to the United States, Zhengang and Plaintiff observed Xiaolan and other employees engaging in fraudulent business practices in their operation of the luxury store. Plaintiff's fears came to fruition in early December 2014 when Xiaolan and Guizhi began executing several IOU notes and forbearance agreements to Zhengang. *See* ECF No. 6 at 37.

On January 6 and 15, 2015, Plaintiff and Zhengang met with Chang to discuss their concerns surrounding their EB-5 application, including their suspicion that Peide and Xiaolan embezzled Plaintiff's EB-5 investment. Plaintiff states that even though she requested to see a translated copy of her EB-5 application, Chang did not provide it and claimed ignorance as to the missing funds or leases which contributed to the insolvency of KZDJ. ECF No. 6 at 37.  It was

not until March 16, 2015 that Chang finally gave Plaintiff a copy of the EB-5 application in English without any companion translation. *Id.*

The controversy spawned litigation in the Circuit Court for Montgomery County between Xiaolan, Zhengang, Plaintiff, transferees of property belonging to KZDJ, and Xiaolan's alleged co-conspirators. During this litigation, Plaintiff believes that she had discovered numerous errors in her EB-5 application, and so in July 2015, Zhengang demanded that the EB-5 application be withdrawn. *See* ECF No. 6-8 at 12.

On July 23, 2016, Plaintiff filed her initial complaint in this Court against the Defendants. ECF No. 1, and her amended complaint on October 14, 2016, alleging five counts: (1) Negligence/Malpractice; (2) Breach of Fiduciary Duty; (3) Breach of Contract; (4) Negligent Misrepresentation; and (5) Fraud. ECF No. 6. On December 2, 2016, the Defendants moved to dismiss the amended complaint or alternatively for summary judgment. ECF No. 13.

## II.      STANDARD OF REVIEW

The parties rely on exhibits attached to the Defendants' motion and Plaintiff's reply in their briefs. Pursuant to Fed. R. Civ. P. 12(d), such materials may be considered only if the motion to dismiss is treated as a motion for summary judgment and Plaintiff is given an opportunity to respond. Fed. R. Civ. P. 12(d). Whether to convert a motion to dismiss to one for summary judgment is a matter within the Court's "complete discretion." *Sager v. Hous. Comm'n of Anne Arundel Cty.*, 855 F. Supp. 2d 524, 542 (D. Md. 2012). At the July 11th hearing, the Court discussed with the parties its preliminary intention to treat the Defendants' motion as one for summary judgment.  After further review, however, the Court declines to exercise that

discretion here. Because a more robust factual development is necessary on certain of the claims, summary judgment determinations are deferred.[5]

The purpose of a motion to dismiss is "to test the sufficiency of [the] complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Ordinarily a complaint need only satisfy the minimal pleading requirement of Rule 8(a)(2) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief." However, when the allegations in the complaint sound in fraud, the complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). When the heightened pleading requirement of Rule 9(b) applies, the plaintiff must allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

When testing the sufficiency of a complaint, courts may "consider documents attached to the complaint" under Fed. R. Civ. P. 10(c), provided they are "integral to the complaint and authentic." *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Documents contemplated by Rule 10(c) include "contracts, notes, and other writing[s] on which [a party's] action or defense is based," but not affidavits. *Rose v. Bartle*, 871 F.2d 331, 339 n.3 (3d Cir. 1989) (alterations in original), quoted in *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013).

Here, Plaintiff has attached numerous exhibits to her amended complaint. They include contracts, bank statements, emails, checks, letters, and business documents. Those documents are "integral" to the amended complaint because they support the Plaintiff's fraud, breach of

---

[5] In this same vein, the Court notes that the parties agreed at the hearing that if the Court were to deny summary judgment, they would jointly request that discovery proceed in the ordinary course. This joint request further supports the Court's view that summary judgment is premature.

contract, and other tort claims. *See Malinowski v. Lichter Grp., LLC*, No. WDQ-14-917, 2015 WL 857511, at *4 (D. Md. Feb. 26, 2015); *Green Ventures Int'l, LLC, P'ship v. Guttridge*, No. 2:10-CV-01709-MBS, 2010 WL 5019363, at *4 n.4 (D.S.C. Dec. 1, 2010) (emails attached to complaint were integral to fraud allegations). The Defendants do not challenge the authenticity of these documents. The Court will consider these documents, but will not consider Plaintiff's declaration, ECF No. 6-2 at 13–14, or the excerpts from deposition testimony created in related cases, *see, e.g.*, ECF No. 6-1 at 1–2. *Malinowski*, No. WDQ-14-917, 2015 WL 857511, at *4 (D. Md. Feb. 26, 2015), *but see Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) ("There is no uniform rule among the circuits with respect to whether an affidavit attached as an exhibit to a pleading is a 'written instrument' such that it may be considered by a district court in resolving a Rule 12(b)(6) or Rule 12(c)."); *cf. Barnard v. Lackawanna Cty.*, 194 F. Supp. 3d 337, 340 (M.D. Pa. 2016) (explaining that depositions are not considered "written instruments" under Rule 10(c)) (citing cases).

## III.    ANALYSIS

### A.    Choice of Law

This Court is presiding over a diversity action in Maryland, and thus applies Maryland choice of law rules. *See Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999) ("A federal court sitting in diversity must apply the choice-of-law rules from the forum state.") (applying Maryland law). For causes of action sounding in tort, Maryland adheres to the *lex loci delicti* rule, applying the substantive law of the state in which the alleged tort took place. *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 744–45 (2000). For causes of action sounding in contract, Maryland follows the doctrine of *lex loci contractus*, applying the substantive law of the place where the contract was formed. *Allstate Ins. Co. v. Hart*, 327 Md. 526, 529 (1992). A legal

malpractice action may sound in either tort or contract depending upon the context. *McCoubrey v. Kellogg, Krebs & Moran*, 7 F. App'x 215, 219 (4th Cir. 2001).

The parties' retainer agreement includes a choice-of-law clause, which states that any litigation arising from the legal services agreement "shall be governed and construed under the laws of the District of Columbia." ECF No. 6-4 at 14. The parties entered into the retainer agreement in the District of Columbia and the events giving rise to Plaintiffs' causes of action occurred in the District of Columbia, including attorney-client consultations with Plaintiff, Zhengang, and Xiaolan, and the Defendants' review of Plaintiff's immigration forms took place in the District. Both parties, and the Court, agree that District of Columbia law applies to Plaintiffs' claims.

**B.     Count One (Legal Malpractice)**

To succeed on a legal malpractice claim, the plaintiff must show that (1) the defendant was employed as the plaintiff's attorney, (2) the defendant breached a reasonable duty, and (3) that breach resulted in, and was the proximate cause of, the plaintiff's loss or damages. *Martin v. Ross*, 6 A.3d 860, 862 (D.C. 2010) (citing *Niosi v. Aiello*, 69 A.2d 57, 60 (D.C. 1949)).

Plaintiff alleges that, after the Defendants agreed to help her obtain an EB-5 visa, their services fell below the standard of care for legal counsel. Plaintiff specifically points to the Defendants' failures to (1)  translate certain documents for Plaintiff into her native tongue; (2) communicate with her or her designated representative, BLC; (3) provide critical documents to her; and (4) keep her apprised of transfers of her investment or notify her when Xiaolan and her conspirators began making unauthorized use of her investment. *See* Amend. Compl., ECF No. 6 at 43–46. Plaintiff also alleges that Chang filed her EB-5 application with "glaring

inconsistencies" and "fraudulent signatures" which exposed Plaintiff to sanctions from USCIS. Change's misconduct thereby forced Plaintiff to withdrawal her application.

The Defendants first counter that their attorney-client relationship with Plaintiff did not begin until June 2013 when Chang met with Xiaolan to discuss Plaintiff's EB-5 application. *See* ECF No. 13-1 at 21–25. Thus, according to the Defendants, Chang cannot be held liable for Plaintiff's claimed injuries arising from the execution of the Business Agreement and the allegedly fraudulent transfer of Plaintiff's funds because these acts all predated their involvement as Plaintiff's attorneys.

It is fundamental that a lawyer's duty to her client begins only after the attorney-client relationship is established. *Hinton v. Rudasill*, 624 F. Supp. 2d 48, 53 (D.D.C. 2009) (applying District of Columbia law); *see also Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 45 (D.D.C. 2010). An attorney-client relationship is formed when a client and attorney "explicitly or by their conduct, manifest an intention to create the attorney/client relationship." *Headfirst Baseball LLC v. Elwood*, 999 F. Supp. 2d 199, 209 (D.D.C. 2013) (quoting *In re Ryan*, 670 A.2d 375, 379 (D.C. 1996)) (internal quotations omitted). In determining whether an attorney-client relationship exists, courts consider a variety of factors, including whether the client sought professional advice or assistance from the attorney, whether the attorney took action on behalf of the client, and whether the attorney represented the client in proceedings or otherwise held himself out as the client's attorney. *Teltschik*, 683 F. Supp. 2d at 45 (citing *In re Lieber*, 442 A.2d 153, 156 (D.C. 1982); *In re Shay*, 756 A.2d 465, 474–75 (D.C. 2000); *In re Bernstein*, 707 A.2d 371, 375 (D.C. 1998)). Notably, "neither a written agreement nor the payment of fees is necessary to create an attorney-client relationship," and an attorney need not

take substantive action or give legal advice to establish such a relationship. *In re Lieber*, 442 A.2d at 156 (citing cases).

Plaintiff has alleged that the attorney-client relationship began in March 2013 with sufficient factual detail to survive dismissal. She alleges that, on or about March 10, 2013, Plaintiff asked Zhengang to travel to the United States to discuss the EB-5 program with Chang. ECF No. 6 at 9. On March 11, he, along with Xiaolan, met with Chang at his office and discussed the EB-5 process. *Id.* On March 14, Zhengang then returned to China to assemble the documents Chang needed to begin the EB-5 application process—conduct consistent with having met and discussed the EB-5 with Chang. *See id.* at 11. Plaintiff then allegedly sent Chang the required documents on May 12, 2013, before the June 2013 meetings. *See id.* at 12; ECF No. 6-2 at 11–12.

But this does not end the analysis. Even assuming an attorney-client relationship existed as of March 2013, the Plaintiff must demonstrate that the attorney failed to exercise that "'degree of reasonable care and skill expected of lawyers acting under similar circumstances.'" *Seed Co. Ltd. v. Westerman*, 832 F.3d 325, 335 (D.C. Cir. 2016) (quoting *Morrison v. MacNamara*, 407 A.2d 555, 561 (D.C. 1979)). Whether an attorney has breached the applicable standard of care typically is reserved for the factfinder, and usually involves the introduction of expert testimony to establish the standard of care. *See Hickey v. Scott*, 796 F. Supp. 2d 1, 3 (D.D.C. 2011); *Chase v. Gilbert*, 499 A.2d 1203, 1211 (D.C. 1985) ("Expert testimony must be presented to establish the standard care unless the attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge.") (internal citation and quotation marks omitted).

At this stage, Plaintiff has sufficiently alleged that the Defendants' representation fell below the applicable standard of care. Plaintiff points specifically to Defendants' failure to review the Business Agreement with her and give counsel as to any potential issues that may arise. *See* Amend. Compl., ECF No. 6 at 21. Indeed, Chang never even requested a copy of the Business Agreement, even though he knew of its existence as of July 17, 2013. *Id.* Because Chang did not review the Business Agreement and its English translation, he likewise did not inform Plaintiff of the material differences between the two. Chang's failure to review with Agreement meant that he missed its lack of conformance with the USCIS's "at risk" investment requirement. *See* Amend. Compl., ECF No. 6 at 11.

Plaintiff likewise points to Defendants' negligently communicating with Xiaolan as Plaintiff's agent without Plaintiff's authorization, including Chang's private conversations with Xiaolan on June 14 and 15, 2013 when they discussed Plaintiff's EB-5 visa application and her $1 million investment. ECF No. 6 at 13–14. This was also when Xiaolan informed Chang that Plaintiff's investment would be used to fund two businesses: a duty-free gift shop and a pan Asian restaurant. *See id.* at 14. According to Chang's notes from these meetings, the two businesses would be reported under the same federal tax identification number to satisfy the EB-5 requirement for a single business enterprise. *See id.* Plaintiff contends that Xiaolan's decision to fund two businesses from her investment instead of one made KZDJ untenable, given the additional start-up costs and operating expenses. Most problematic, Plaintiff alleges neither she nor Zhengang were in the United States at the time of these appointments and had no idea they had taken place. Had the Defendants informed Plaintiff of this meeting and its contents, Plaintiff would have prevented Xiaolan from pursuing this strategy with her investment funds.

Plaintiff similarly points to evidence that Chang failed to communicate with her authorized agent, Lydia, and instead persisted in using Xiaolan as the intermediary, even after Plaintiff directed Chang to send all communications through BLC to Plaintiff and Zhengang. *See* Amend. Compl., ECF No. 6 at 15; *see also* Email, ECF No. 6-3 at 10. Lydia, on behalf of Plaintiff, sent several other emails to Chang requesting a status update regarding Plaintiff's EB-5 application. ECF No. 6 at 17; ECF No. 6-3 at 17–18. Chang did not respond to these emails. Rather, Chang used Xiaolan as Plaintiff's representative. *See, e.g.*, Amend. Compl., ECF No. 6 at 18–19; ECF No. 6-4 at 8, 11. Indeed, after Defendants filed Plaintiff's EB-5 application, Plaintiff alleges that they did not notify her of its filing or provide her a copy of the filed application. Amend. Compl., ECF No. 6 at 35. But Chang did forward the application to Xiaolan. When Lydia requested a copy of the application on behalf of Plaintiff, Chang simply informed Lydia that he had already sent a copy to Xiaolan. *See* ECF No. 6-8 at 4.

Notably this all occurred against the backdrop of Xiolan's fraudulently transferring Plaintiff's investment to other business ventures. Plaintiff avers that Chang knew of this fraud and failed to alert her. On August 5, 2013, Xiaolan emailed photographs to Chang depicting an April 2013 SunTrust Bank statement that shows Plaintiff's $1,020,000 investment deposited on April 26, 2013 into the KZDJ SunTrust 9485. However, the bank statement also shows that the entire sum was immediately removed and placed into the KZJD SunTrust account ending in 9337. *See* ECF No. 6-3 at 8–17. The email also includes photographs of an allegedly falsified signature card dated March 11, 2013, which purports to add Xiaolan and Guizhi to the SunTrust 9485 account. The documents appear to have both Zhengang and Plaintiff's signature. However, the original SunTrust documents include only the signatures of Zhengang, Qing, and Peide. Neither Plaintiff nor Zhengang were copied on this August 5th email and Chang allegedly made

no attempt to verify these documents with Plaintiff or Zhengang. Simply put, a reasonably well trained, educated and experienced attorney would have done more to safeguard his client's interests.

Defendants essentially counter that Plaintiff's complaints do not amount to professional negligence. Central to Defendants's argument is their claimed scope of representation: they assert that they were to assist Plaintiff in obtaining an EB-5 visa and nothing more. *See* ECF No. 13-1 at 25. Based on this limited representation, they claim that Chang had no obligation to review the Business Agreement; thus, any damage that Plaintiff incurred as a result of the errors in this document should be borne by Xiaolan and her confederates, not the Defendants. Defendants point to the retainer agreement which confines their services to the EB-5 visa petition, and not any "security and/or financial aspects of the investment." The agreement further instructs the client "to seek independent advice on [certain financial aspects of the investment] from a financial advisor, business advisor, business or securities lawyer or accountant." Retainer Agreement, ECF No. 6-4 at 13.

Plaintiff, however, aptly notes that Zhengang signed the Business Agreement precisely because she hired Chang to review it and advise her as to its compliance USCIS's EB-5 Program requirements. ECF No. 14-5 at 5–6. Plaintiff also highlights that the retainer agreement specifically provides that:

> [WMC] will assist you in the feasibility period including advising you about the availability of the business entities to invest in. When you decide to go forward with the investment and the EB-5 application, *we will review the investment agreement and advise you about the issues and documents involved*.

ECF No. 6-4 at 12 (emphasis added). Thus, the scope of Defendants' representation, as pled, included reviewing the Business Agreement and advising Plaintiff "about the issues and documents involved."

Defendants also take issue with whether Xiaolan was Plaintiff's authorized agent. *See* ECF No. 13-1 at 25–26. According to the Defendants, Xiaolan is Plaintiff's designated agent according to the English version of the Business Agreement. *See* ECF No. 6-2 at 4 ECF No. 6-2 at 3. ("During the EB-5 application, [Xiaolan and Guizhi Yuan] will cooperate with the immigration lawyer."). Chang also attests that Xiaolan held herself out to Chang as Plaintiff's agent for the purpose of the EB-5 petition. *See* ECF No. 13-2 at 3, and that neither Plaintiff nor Zhengang ever instructed him to cease communications with Xiaolan until January 2015. *Id.*

Plaintiff's amended complaint specifically avers, however, that she did not designate Xiaolan as her agent with authority to communicate with the Defendants. Likewise, Plaintiff asserts that because they were working through Xiaolan, Defendants also failed to adequately communicate with Plaintiff on matters pertaining to her EB-5 petition. These allegations are sufficient to sustain Plaintiff's professional negligence claim.

Defendants nonetheless maintain dismissal is warranted because even if they breached their duties to Plaintiff, such breach was not the proximate cause of her injuries. *See* ECF No. 13-1 at 26–28. In a nutshell, Defendants claim that Plaintiff's losses were the result of Xiaolan's embezzlement, not Chang's negligence.[6] Defendants similarly argue that Plaintiff's legal malpractice claim must fail to the extent that Plaintiff is seeking damages as a result of not receiving an EB-5 visa. ECF No. 13-1 at 28. This is so, say Defendants, because "[Plaintiff's] EB-5 petition was doomed to fail regardless of any alleged negligent actions or inactions by the Defendants through the representations," and because the Business Agreement converted her

---

[6] Defendants raise the companion argument that because Plaintiff's $1 million was fraudulently diverted prior to the formation of the attorney-client relationship, any alleged malpractice cannot be the cause of Plaintiff's harm. As discussed *infra*, a genuine issue of material disputed fact exists as to when the attorney-client relationship began. If the factfinder credits Plaintiff's evidence, then the embezzlement occurred after the attorney client relationship began. Accordingly, Defendants proximate cause argument on this basis must be rejected for the same reasons.

investment into a loan which ran afoul of USCIS's "at risk" requirement. ECF No. 13-1 at 28. The Court disagrees.

As in all negligence based actions, legal malpractice "is predicated on a finding that the injury was proximately caused by the breach of duty." *Dalo v. Kivitz*, 596 A.2d 35, 41 (D.C. 1991) (citing *District of Columbia v. Freeman*, 477 A.2d 713, 715–16 (D.C. 1984) (tortious act must "play a central role" in the injury or be a "substantial factor" leading to the harm)). Proximate cause is satisfied where the evidence shows a "substantial and direct causal link" between the attorney's breach and the injury sustained by the client, *Freeman*, 477 A.2d at 716. Proximate cause is also "normally a question of fact reserved for the jury." *Hickey v. Scott*, 796 F. Supp. 2d 1, 4 (D.D.C. 2011) (quoting *Royal Ins. Co. of Am. v. Miles & Stockbridge, P.C.*, 133 F. Supp. 2d 747, 762 (D. Md. 2001) (applying Maryland law)) (internal quotations omitted). "Although it is sufficient to show that the movant could have 'fared better' in reaching the ultimate goal sought, . . . or that there would have been a difference in the trial's outcome, . . . more is required than speculation." *Chase v. Gilbert*, 499 A.2d 1203, 1212 (D.C. 1985) (internal citations omitted).

Here, Plaintiff has sufficiently alleged that Defendants' representation included review of the Business Agreement for USCIS compliance. Had the Defendants' reviewed the Agreement, so the argument goes, they would have noticed that it did not comply with the EB-5 Program and warned Plaintiff accordingly. Likewise, had Defendants reviewed the Agreement and performed the related due diligence, it would have uncovered Xiaolan's embezzlement prior to the unauthorized dissipation of her funds and with sufficient time to claw back her investment. Plaintiff has averred sufficient facts on proximate cause. Defendant's motion is, therefore, denied as to Count One.

**C.      Breach of Fiduciary Duty and Breach of Contract (Counts Two and Three)**

A claim for breach of fiduciary duty is similar in many respects to a claim for legal malpractice. Under District of Columbia law, a plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of the duties associated with that relationship, and (3) injuries that were proximately caused by the breach of the fiduciary duty. *Armenian Genocide Museum & Memorial, Inc. v. The Cafesijian Family Found., Inc.*, 607 F. Supp. 2d 185, 190–91 (D.D.C. 2009). While a legal malpractice claim is based on negligence—or, a breach of the standard of care—a fiduciary duty claim rests on the breach of a fiduciary duty, or a "standard of conduct." *Bolton v. Crowley, Hoge & Fein, P.C.*, 110 A.3d 575, 583 (D.C. 2015) (explaining the difference between legal malpractice and fiduciary duty claims). Accordingly, claims of negligent representation do not suffice to sustain a claim for a breach of fiduciary duty.

For this reason, courts in the District of Columbia often dismiss claims for breach of fiduciary duty as duplicative of the plaintiff's malpractice claim because the claims are essentially indistinguishable. *See, e.g.*, *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 78 (D.D.C. 2015) ("Under D.C. law, when a plaintiff's breach of fiduciary duty claim is indistinguishable from her legal malpractice claim, her inability to prove the malpractice claim renders the fiduciary duty claim unsustainable." (quoting *Johnson v. Sullivan*, 748 F. Supp. 2d 1, 12 (D.D.C. 2010) (internal quotations and alterations omitted)); *Mawalla v. Hoffman*, 569 F. Supp. 2d 253, 257 (D.D.C. 2008) ("In professional malpractice cases, additional claims which are based on the underlying malpractice claim cannot survive if the professional malpractice claim fails." (citing *Macktal v. Garde*, 111 F. Supp. 2d 18, 23 (D.D.C. 2000)); *N. Am. Catholic Educ. Programming Found., Inc. v. Womble, Carlyle, Sandridge & Rice, PLLC*, 887 F. Supp. 2d 78, 83 (D.D.C. 2012) (dismissing plaintiff's fiduciary duty claim, among others, because there

were "based on the same sets of facts and seek identical relief.").[7] The Defendants follow this

lead, and summarily argue that Plaintiff's malpractice and fiduciary duty claims "completely

overlap" and therefore must be dismissed. *See* ECF No. 13-1 at 28.

Plaintiff's breach of fiduciary duty claim, to be sure, mirrors her professional negligence

case as to the duty of care. But the claims differ in one important respect. In her fiduciary duty

claim, Plaintiff alleges that the Defendants breached duty of care by "knowingly or recklessly"

facilitating the transfer of Xiaolan's investment to Xiaolan for her personal use. ECF No. 6 at 46.

She also alleges that the Defendants "knowingly and recklessly" concealed their knowledge of

said transfers, *id.*, actions that may fall below an attorney's standard of conduct. The Defendants

do not argue otherwise. Moreover, Plaintiff's duty of loyalty claim is centered on the allegation

that the Defendants provided legal advice to Xiaolan, whose interests conflicted with those of

Plaintiff. These allegations are not part of Plaintiff's legal malpractice claim. Accordingly, the

two counts allege sufficiently distinct misconduct so that Defendants' motion must be denied as

to Count Two.

The Defendants also argue that Plaintiff's breach of contract claim should be dismissed

as duplicative. *See* ECF No. 13-1 at 28–29. The Court agrees. Plaintiff's breach of contract count

is based on the exact conduct giving rise to her legal malpractice claim. Specifically, she alleges

that "Defendants breached the legal services contract by failing to: (a) review the investment

agreement: (b) inform [Plaintiff] of their concerns that KZDJ did not have 10 fulltime

---

[7] *See also, e.g.*, *Hinton v. Rudasill*, 384 F. App'x 2, 2 (D.C.Cir. 2010) ("[A]ppellant cannot recast his malpractice claim as a breach of fiduciary duty claim . . . and he has not shown that his claims of negligence, breach of care, breach of trust, and bad faith are distinguishable from his malpractice claim.") (citation omitted); *Iacangelo v. Georgetown University*, 760 F. Supp. 2d 63, 66 (D.D.C. 2011) ("[T]he plaintiffs' claim for breach of fiduciary duty is entirely duplicative of their claims for medical malpractice and lack of informed consent; this claim rests on the same factual allegations as the other two, would be decided under the same legal standards as one or the other of those claims, and authorizes the same forms of relief."); *Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 670 n.4 (D.C. 2009) ("Biomet's attempt to recast its [legal] malpractice argument as also breach of contract and breach of fiduciary duty fails.")

employees, and (c) provide competent representation." ECF No. 6 at 48. *Cf. N. Am. Catholic Educ. Programming Found., Inc.*, 887 F. Supp. 2d at 83 ("The plaintiff's claims for breach of contract, breach of the implied duty of good faith and fair dealing, and breach of fiduciary duty are duplicative of its malpractice claim and must be dismissed."); *Biomet Inc.*, 967 A.2d at 670 n.4 (D.C. 2009) ("Biomet's attempt to recast its [legal] malpractice argument as also breach of contract and breach of fiduciary duty fails."). Accordingly, the Defendants' motion is granted on Count Three.

### D.      Negligent Misrepresentation (Count Four)

In the District of Columbia, the elements of negligent misrepresentation are (1) a false statement or omission of a fact that a defendant had a duty to disclose; (2) that the defendant intended or should have recognized that the plaintiff would be deleteriously affected by reliance on the misrepresentation; and (3) that the plaintiff reasonably relied upon the misrepresentation to her detriment. *Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 75 (D.D.C. 2012) (citing *Hall v. Ford Enter., Ltd.*, 445 A.2d 610, 612 (D.C. 1982)).

Plaintiff's negligent misrepresentation claim rests principally on Chang's communications to Zhengang regarding the timeline of Plaintiff's EB-5 petition. Specifically, on October 7, 2013, Zhengang allegedly met with Chang who assured Zhengang that her EB-5 petition process was moving along smoothly. ECF No. 6 at 49. Chang further represented that, upon filing the EB-5 application, Plaintiff could expect her conditional admission to the United States within forty-five days. *Id.*

Believing that their immigration to the United States was imminent, Zhengang and Plaintiff decided to pursue an investment opportunity with Peide to purchase a multiuse commercial building in Rockville, Maryland. *Id.* at 49–50. Plaintiff and Zhengang provided a

down payment of over $318,000 in currency and credit toward the purchase of the commercial building. *Id.* at 50. Xiaolan and Peide later cancelled the commercial building contract and allegedly misspent the down payment.

Chang filed Plaintiff's EB-5 petition on November 19, 2013, after Zhengang and Plaintiff had forwarded Peide the money to secure the Rockville commercial building. When Chang filed the EB-5 application, he received a notice from USCIS that the timeline for processing an EB-5 application was, on average, approximately thirteen months. *See* ECF No. 6-8 at 9–10. On October 14, 2014, Zhengang, Guizhi, and Plaintiff met with Chang who allegedly reiterated that Plaintiff's EB-5 application would be approved within forty-five days. Plaintiff asserts, therefore, that Chang's forty-five-day assurance was a false representation; that the Defendants should have known Plaintiff would rely on this representation; and that Plaintiff did so to her detriment by pursuing an investment with Xiaolan and Peide that turned out to be another part of their fraudulent scheme. *See generally* ECF No. 6 at 49–50 (outlining Plaintiff's negligent misrepresentation allegations).

The Defendants counters that Plaintiff's negligent misrepresentation claim must fail for several reasons. *See* ECF No. 13-1 at 30–32. First they argue that Chang's alleged reassurance of the EB-5 timeline during the October 2014 meeting was accurate because Plaintiff's petition had been outstanding for approximately eleven months. Second, they argue that the statement amounts to aspirational predictions about future events, and so are not demonstrably false statements. Third, the Defendants argue that even if Chang's statement was false, it is nothing more than a mistake of legal professional judgment and not an act of negligent misrepresentation. Finally, they argue that Plaintiff could not have *reasonably* relied on the statement to purchase the commercial property because this investment had nothing to do with

the EB-5 petition. Also, by that time, Plaintiff was aware that Xiaolan and Guizhi had defaulted on their payments for the investment loan pursuant to the Business Agreement. Thus, Plaintiff must take some responsibility for entering into a separate transaction with business partners who had already failed her once before.

The Court agrees with the Defendants, at least in part, and thus concludes that Plaintiff's negligent misrepresentation claim as it relates to Chang's 45-day assurance fails as a matter of law. Under District of Columbia law, to recover for a negligent misrepresentation claim, a plaintiff must prove "that the defendant's challenged conduct proximately caused [the] plaintiff's injury." *Steele v. Isikoff*, 130 F. Supp. 2d 23, 34 (D.D.C. 2000) (citing *Thompson v. Shoe World, Inc.*, 569 A.2d 187, 189 (D.C. 1990)). A defendant's challenged conduct is the proximate cause of a plaintiff's injury "only if 'the injury is the natural and probable consequence of the negligence or wrongful act and ought to [have been] foreseen in light of the circumstances.'" *Steele*, 130 F. Supp. 2d at 34 (quoting *Sanders v. Wright*, 642 A.2d 847, 849 (D.C. 1994)). "Proximate cause is generally a factual issue to be resolved by the jury, however, it becomes a question of law when the evidence adduced at trial will not support a rational finding of proximate cause." *Majeska v. D.C.*, 812 A.2d 948, 950 (D.C. 2002) (quoting *Washington Metro. Area Transit Auth., et al., v. Davis*, 606 A.2d 165, 170 (D.C. 1992)) (quotation marks omitted).

Here, Plaintiff's amended complaint is insufficient as to proximate cause. Plaintiff does not allege, nor can she, that had her EB-5 petition been approved within forty-five days as Chang promised, the outcome of Plaintiff's second investment with Peide would have been any different. While Chang's promise may have animated Plaintiff's decision to pursue the investment opportunity, it had nothing to do with Xiaolan's and Peide's alleged fraud—the true cause of Plaintiff's injury. In fact, Plaintiff, Xiaolan, and Peide consummated the new deal

*before* Chang filed Plaintiff's EB-5 petition and thus before the alleged 45-day clock began. Moreover, Plaintiff does not allege that she informed Chang of her decision to pursue this investment opportunity, let alone that she was doing so on Chang's assurance that the EB-5 review process would take little time. In this way, Plaintiff has failed to demonstrate that her injury "is the natural and probable consequence" of Chang's statement or that the loss of her investment "ought to [have been] foreseen in light of the circumstances." *Steele*, 130 F. Supp. 2d at 34. Accordingly, the Defendants' motion to dismiss is granted in this respect.

Plaintiff argues that Chang's promise of a speedy petition process was not the only instance of negligent misrepresentation she pleaded. Indeed, the amended complaint incorporates into Count Four Plaintiff's previous allegations. *See* ECF No. 6 at 49. She specifically highlights paragraph 214 of her amended complaint which reads:

> WMC and Chang owned [sic] a duty of care to both [Plaintiff] and KZDJ to refrain from engaging in grossly negligent or reckless conduct including their repeated failures to disclose to [Plaintiff] facts a reasonable person in similar circumstances would want to know including that:
>
> a.     On April 26, 2016, [Plaintiff]'s entire $1,020,000 investment was removed from the KZDJ 9485 business checking account.
>
> b.     Xiaolan failed to produce monthly bank statements, canceled checks or proof of expenses regarding the EB-5 investment.
>
> c.     All bank statements were being sent to the home of Xiaolan and Peide.
>
> d.     KZDJ was in danger of losing its qualifying status by failing to employ 10 full time employees.
>
> e.     Qing and Peide had signed on behalf of KZDJ the ALB Lease which required monthly payments of $8,333.00.
>
> f.     Qing and Peide had signed on behalf of KZDJ the Restaurant Lease which required KZDJ to make monthly payments of $12,000.00.
>
> g.     The landlord for ALB and Zhang Restaurant demanded and received from KZDJ $150,000 for security deposited [sic] for both ALB and Zhang Restaurant.

       h.      Xiaolan was holding herself out as a partner and claiming an ownership interest in KZDJ.

ECF No. 6 at 45–46. These failures, according to Plaintiff, are other instances of negligent misrepresentation.

Defendants do not challenge the sufficiency of these factual averments. Rather, Defendants erroneously contend that Plaintiff has raised these bases for the first time in her briefs and should not be permitted to amend her complaint via the pleadings. *See* ECF No. 15 at 10 (citing, *inter alia*, *Zachair Ltd. V. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint")). But the amended complaint incorporates all factual assertions made throughout into her negligent misrepresentation claim. Defendants, therefore, cannot cry foul because they were put on notice of these very allegations in support of the negligent misrepresentation count. Accordingly, the majority of Plaintiff's misrepresentation claim survives. However, to the extent Plaintiff relies on Defendant's promises of a speedy petition process as the basis for her negligent misrepresentation claim, those allegations are dismissed.

## E.      Count Five (Fraud)

To establish fraud under District of Columbia law, a plaintiff must prove: (1) the defendant made a false representation; (2) in reference to a material fact; (3) with knowledge of its falsity; (4) with the intent to deceive the plaintiff; (5) the plaintiff acted in reasonable reliance on that representation; (6) which consequently resulted in provable damages. *C & E Servs., Inc. v. Ashland, Inc.*, 498 F. Supp. 2d 242, 255 (D.D.C. 2007) (citing *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002); *Dresser v. Sunderland Apartments Tenants Ass'n,*

*Inc.*, 465 A.2d 835, 839 (D.C. 1983); *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997)). "To find that a misstatement was made with knowledge of its falsity, the person accused . . . must be found to have known that the statement was false, or to have made that statement with reckless indifference as to its truth." *Powell v. District of Columbia Housing Authority*, 818 A.2d 188, 197 (D.C.2003). Rule 9(b) of the Federal Rules of Civil Procedure requires that a "party . . . state with particularity the circumstances constituting fraud or mistake."

Plaintiff's fraud claim stems from Chang's alleged failure to advise Plaintiff and Zhengang that KZDJ Inc. would be a two-layered business—a DC store and a pan-Asian restaurant—for the purposes of the EB-5 petition. The amended complaint specifically alleges, "upon information and belief," that Chang intentionally misrepresented that KZDJ was a single business enterprise and that that "Chang received compensation from Peide and Xiaolan to facilitate the multilayer structure." Amend. Compl., ECF No. 6 at 52. In other words, Plaintiff asserts that the Defendants deliberately omitted Xiaolan's intent to fund two separate businesses with Plaintiff's investment to receive additional compensation from Peide and Xiaolan. These allegations are sufficient to satisfy Rule 9(b) and avoid dismissal.

Defendants contend nonetheless that Plaintiff's fraud claim fails to meet Rule 9(b)'s heightened pleading standard. *See* ECF No. 13-1 at 33. Specifically, Defendants argue that Plaintiff "has not and cannot allege sufficient facts to create an inference that Chang 'intentionally' failed to disclose the two-layered business structure." *Id.* Rule 9(b) allows "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Plaintiff has done so here.

Defendants also argue that Plaintiff has failed to allege that Defendants statements to Xiaolan regarding the two-layered business structure were mere legal opinions and not factual misrepresentations. *See* ECF No. 13-1 at 34 (citing *De May v. Moore & Bruce, LLP*, 584 F. Supp. 2d 170, 185 (D.D.C. 2008) (explaining that erroneous legal advice normally does not constitute a factual misrepresentation)). Additionally, Defendants maintain that Xiaolan was Plaintiff's agent for purposes of the EB-5 petition process.

Defendants overlook, however, Plaintiff's plausible allegations that Xiaolan was never designated as Plaintiff's agent. This allegation must be taken as true at this stage. Further, Defendants' argument misconstrues the basis of Plaintiff's fraud claim. Although Plaintiff takes issue the Defendants' role in moving forward with the two-layered business structure, the basis of her fraud claim is that the Defendants intentionally kept this decision from Plaintiff, which advanced the Defendants' and Xiaolan's interests at the expense of the Plaintiff. Because Plaintiff's allegations are sufficient at the motion to dismiss stage, Count Five survives.

## F.   Defendants' Unclean Hands Defense

Defendants' last claim is that Plaintiff claims are barred under the doctrine of unclean hands. "The unclean hands doctrine derives from the equitable maxim that 'he who comes into equity must come with clean hands.'" *U.S. v. Philip Morris, Inc.*, 300 F. Supp. 2d 61, 74 (D.D.C. 2004) (quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945)). "The doctrine 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.'" *Id.* (internal citation omitted). According to the Defendants, Plaintiff and Zhengang never produced the Business Agreement to the Defendants and the nature of the Agreement was knowingly withheld from USCIS. The Defendants allege that Plaintiff and Zhengang kept the nature of the

Agreement secret because they knew it did not comply with the requirements for an EB-5 petition, and disclosing such information would place their goal of immigration at risk.

Taking the facts as alleged in the amended compliant as true, the Court cannot credit Defendants unclean hands position at this juncture. Indeed, Plaintiff alleges that she did not know that the Business Agreement failed to comply with the EB-5 requirements and in fact hired Chang to assure compliance. Thus, according to Plaintiff, any missteps in the petition process fall on the Defendants, not Plaintiff. Defendants' motion is denied on this basis.

## IV.     CONCLUSION

Based on the foregoing, the Defendants' motion to dismiss is granted in part and denied in part. It is denied with respect to Counts One (Legal Malpractice), Two (Breach of Fiduciary Duty), and Five (Fraud). It is granted with respect to Count Three (Breach of Contract). The motion is granted with respect to Count Four (Negligent Misrepresentation) to the extent it rests on the Defendants' alleged promise to Plaintiff of a speedy EB-5 petition process, but denied in all other respects. A separate order will follow.


8/7/2017                                                                        /S/
Date                                                 Paula Xinis
                                                     United States District Judge